IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**WILLIAM R. CHEATHAM AND MARCUS HUEY,**
*Plaintiffs/Appellees,*


*v.*


**SAL DiCICCIO IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE PHOENIX CITY
COUNCIL; CITY OF PHOENIX; PHOENIX LAW ENFORCEMENT ASSOCIATION,**
*Defendants/Appellants,*

———————


**THOMAS COX; VICTOR ESCOTO; RICHARD V. HARTSON; VIVIAN REQUE;
AND DAVID K. WILSON,**
*Intervenors/Appellants.*

———————


**WILLIAM R. CHEATHAM AND MARCUS HUEY,**
*Plaintiffs/Appellees,*


*v.*


**PHOENIX LAW ENFORCEMENT ASSOCIATION,**
*Defendant/Appellant.*

———————

No.  CV-15-0287-PR
Filed September 13, 2016

———————

Appeal from the Superior Court in Maricopa County
The Honorable Katherine M. Cooper, Judge
No.  CV2011-021634
**REVERSED**


Opinion of the Court of Appeals, Division One
238 Ariz. 69, 356 P.3d 814 (App. 2015)
**VACATED**

———————

COUNSEL:

Jonathan Riches (argued), Scharf-Norton Center for Constitutional

Litigation at the Goldwater Institute, Phoenix, Attorneys for William R. Cheatham and Marcus Huey

Brad Holm, Phoenix City Attorney, Phoenix; and John Alan Doran, Lori Wright Keffer, Matthew A. Hesketh, Sherman & Howard L.L.C., Phoenix, Attorneys for Sal DiCiccio and City of Phoenix

Michael Napier (argued), Cassidy L. Bacon, Napier, Coury & Baillie, P.C., Phoenix, Attorneys for Phoenix Law Enforcement Association

Barbara LaWall, Pima County Attorney, Regina L. Nassen, Deputy County Attorney, Tucson, Attorneys for Amicus Curiae Pima County

David L. Abney, Knapp & Roberts, P.C., Scottsdale, Attorneys for Amicus Curiae PORAC Legal Defense Fund

Larry H. James, Crabbe, Brown & James, LLP, Columbus, OH; and Robert E. Yen, Yen Pilch & Landeen, P.C., Phoenix, Attorneys for Amicus Curiae National Fraternal Order of Police

James S. Burling, Pacific Legal Foundation, Sacramento, CA, Attorneys for Amicus Curiae Pacific Legal Foundation

Roopali H. Desai, Shelley Tolman, Coppersmith Brockelman PLC, Phoenix, Attorneys for Amici Curiae United Phoenix Firefighters Association, Local 493, Professional Fire Fighters of Arizona, and International Association of Fire Fighters

Gerald Barrett, Ward, Keenan & Barrett, P.C., Phoenix, Attorneys for Amicus Curiae National Association of Police Organizations

Susan Martin, Jennifer Kroll, Martin & Bonnett, PLLC, Phoenix; Nicholas J. Enoch, Lubin & Enoch, P.C., Phoenix, Attorneys for Amici Curiae American Federation of State, County and Municipal Employees, Locals 2384 and 2960

_____

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE CHIEF JUSTICE PELANDER and JUDGE HOWARD* joined, and JUSTICES BRUTINEL and TIMMER dissented.

———————————

CHIEF JUSTICE BALES, opinion of the Court:

¶1        The Gift Clause of Arizona's Constitution bars cities and other public entities from "mak[ing] any donation or grant, by subsidy or otherwise, to any individual, association, or corporation."  Ariz. Const. art. 9, § 7.  For decades, the City of Phoenix has contracted in collective bargaining agreements with police officers to allow "release time," that is, to pay officers for certain time spent on behalf of their authorized representative (a police union) rather than regular police duties.  We hold that the release time provisions at issue here do not violate the Gift Clause.

**I.**

¶2        Police officers employed by the City of Phoenix ("the City") are divided into units.  Relevant here is Unit 4, which comprises approximately 2,500 officers, of whom nearly ninety percent are members of the Phoenix Law Enforcement Association ("PLEA").  PLEA is an employee organization or, more colloquially, a police union.  Pursuant to the Phoenix City Code, PLEA is the recognized representative for the Unit 4 officers and, every other year, it negotiates with the City the terms of employment for those officers, whether PLEA members or not.  *See*  Phx. City Code Art. XVII § 2-209.  The agreed upon terms are embodied in a collective bargaining agreement called a Memorandum of Understanding ("MOU"), which governs the officers' wages, hours, and general employment conditions.  Since 1977, every MOU has included provisions for release time, that is, times when officers will be excused from usual police duties, but are still paid by the City, while they perform PLEA activities and conduct PLEA business.

¶3        This litigation began in 2011, when William R. Cheatham and Marcus Huey (collectively "Taxpayers") sued the City, alleging that four

———————————

* Justice Clint Bolick has recused himself from this case.  Pursuant to article 6, section 3, of the Arizona Constitution, the Honorable Joseph W. Howard, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

release time provisions in the 2010–2012 MOU violated the Gift Clause. Taxpayers challenged three provisions that authorized six full-time officers to each receive full pay, benefits, and 160 hours of overtime per year and allocated to other officers a bank of 1,583 release time hours per year for "legitimate [a]ssociation business," including preparing for negotiations with the City. 2010-2012 MOU § 1-3(G), (I), (Q). The fourth challenged category allotted a total of fifteen days of paid leave per year for officers to attend PLEA seminars, lectures, and conventions. *Id.* § 1-3(K). In June 2012, the trial court granted a preliminary injunction after concluding that at least some of the challenged provisions violated the Gift Clause.

¶4          Shortly thereafter, the 2010–2012 MOU was superseded by the 2012–2014 MOU, which contained similar release time provisions. Under the new MOU, the six full-time officers, instead of each receiving 160 hours of overtime, could draw on a bank of 960 hours of overtime for time spent serving on city committees or task forces and the general bank of release time was increased to 1,859 hours. 2012-2014 MOU § 1-3(B)(3), (Q). The 2012-2014 MOU also allowed PLEA to designate up to forty-two representatives who, without losing pay or benefits, and subject to normal departmental scheduling and assignment, could attend grievance meetings and other specified meetings and hearings, when the Unit 4 officer involved in the proceeding designates PLEA as his or her representative. *Id.* § 1-3(B)(2)(a). Time spent by these representatives for purposes other than attending the identified hearings or meetings, such as gathering information or otherwise preparing, would be charged against the bank of release time. *Id.* § 1-3(B). Finally, PLEA was allowed to appoint a legislative representative who would receive 500 hours of release time, provided the officer "has agreed to work with and assist the [C]ity's legislative lobbyist." *Id.* § 1-3(C).

¶5          Taxpayers amended their complaint to challenge the 2012–2014 provisions. The trial court preliminarily enjoined the provisions and, after a bench trial, later issued a permanent injunction, ruling that the provisions violate the Gift Clause because they lack a public purpose and are not supported by adequate consideration. Additionally, the trial court permanently enjoined the City and PLEA from entering into future MOUs with release time provisions absent certain conditions.

¶6          The City and PLEA appealed. Without deciding whether the release time provisions serve a public purpose, the court of appeals held

that they are not supported by adequate consideration, inasmuch as the MOU does "not obligate PLEA to perform any specific duty or give anything in return for the release time." *Cheatham v. Diccicio*, 238 Ariz. 69, 74-75 ¶¶ 16, 20, 356 P.3d 814, 819-20 (App. 2015). The court of appeals affirmed the trial court's order "to the extent that it enjoins the 2012–2014 MOU release time provisions and that it enjoins the City and PLEA from entering into future MOUs or agreements with release time, unless they imposed upon PLEA binding obligations." *Id.* at 76 ¶ 27, 356 P.3d at 821.

¶7 We granted review because whether the Gift Clause bars release time provisions in collective bargaining agreements for public employees is a legal issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3), of the Arizona Constitution and A.R.S. § 12-120.24.

**II.**

**A.**

¶8 We review a trial court's grant of an injunction for an abuse of discretion, *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 366 ¶ 9, 982 P.2d 1277, 1280 (1999), and the interpretation and application of constitutional provisions de novo. *Ross v. Bennett*, 228 Ariz. 174, 176 ¶ 6, 265 P.3d 356, 358 (2011).

¶9 The Gift Clause provides: "Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation." Ariz. Const. art. 9, § 7. The clause has two primary purposes – preventing the "depletion of the public treasury or inflation of public debt by engagement in non-public enterprise" and protecting public funds against use for "the purely private or personal interest of any individual." *Kromko v. Ariz. Bd. of Regents*, 149 Ariz. 319, 320–21, 718 P.2d 478, 479–80 (1986) (internal quotations, emphasis, and citations omitted); *Wistuber v. Paradise Valley Unified Sch. Dist.*, 141 Ariz. 346, 349, 687 P.2d 354, 357 (1984) ("The constitutional prohibition was intended to prevent governmental bodies from depleting the public treasury by giving advantages to special interests[.]").

¶10 A two-prong test determines whether a challenged government expenditure violates the Gift Clause. *See Turken v. Gordon*, 223

Ariz. 342, 348 ¶ 22, 224 P.3d 158, 164 (2010); *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357. The expenditure will be upheld if (1) it has a public purpose, and (2) the consideration received by the government is not "grossly disproportionate" to the amounts paid to the private entity. *Turken*, 223 Ariz. at 345, 348 ¶¶ 7, 22, 224 P.3d at 161, 164. In evaluating Gift Clause challenges, "[a] panoptic view of the facts of each transaction is required," and "courts must not be overly technical and must give appropriate deference to the findings of the governmental body." *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357.

**B.**

**¶11**      Our analysis begins by recognizing that the challenged release time provisions are part of the MOU, a collective bargaining agreement between the City, PLEA as the authorized representative of the Unit 4 officers, and the officers who are subject to the MOU. The MOU in turn must be understood in light of the governing provisions of the Phoenix City Code.

**¶12**      The City Code's Meet and Confer Ordinance recognizes the right of public employees to representation by an employee organization of their choosing and "to meet and confer through an authorized employee organization with their public employer" when negotiating employment terms such as wages or hours. Phx. City Code Art. XVII §§ 2-214(B), 2-210(11). The "authorized representative" – here, PLEA – is formally recognized by the City as representing a majority of the employees of the appropriate unit – here, Unit 4 – and "is authorized to participate in the meet and confer process on behalf of the appropriate unit for the purpose of meeting and conferring on wages, hours, and working conditions." *Id.* § 2-210(2). The Code also requires PLEA, as the employees' representative, to engage in discussions with the City "to resolve grievances and disputes relating to wages, hours, and working conditions." *Id.* § 2-209.

**¶13**      All agreements arrived at by the City and the employees' authorized representative are recorded in an MOU and presented to the City Council and the employee members of the authorized organization for approval. *Id.* § 2-210(12). Thus, a finalized MOU is an agreement that binds the City as the employer, the authorized representative for the employees, and the employees themselves.

**¶14** Under the MOU for Unit 4, release time is a component of the overall compensation package negotiated between the City and PLEA on behalf of the police officers. Before negotiating the specific terms of the 2012–2014 package, the City allocated $660 million for the total compensation of Unit 4 officers. The parties then negotiated the allocation of that amount for various purposes (e.g., hourly compensation, overtime, and paid leave time). In lieu of increased hourly compensation or other benefits, PLEA negotiated for release time provisions worth about $1.7 million over a two-year period, or $322 annually per unit member. One of the City's negotiators testified, without contradiction, that if the City had not agreed to pay for release time, the corresponding amounts would have otherwise been part of the total compensation available. The MOU itself acknowledges that "[t]he cost to the City for these release positions, including all benefits, has been charged as part of the total compensation contained in this agreement in lieu of wages and benefits." 2012-2014 MOU § 1-3(B). Interpreting the MOU is a legal question, and our conclusion that release time is part of the negotiated total compensation package is not affected by the trial court's observing that officers could not simply divide total compensation however they wished or that the MOU does not discuss release time under "Compensation/Wages." Similarly, we do not think that the MOU's characterization of release time as part of total compensation is undermined by one Councilman's statements (made long after the Council had approved the MOU) that different components of compensation are negotiated separately and the agreement does not identify the cost of total compensation. *Cf. Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993) (noting that courts seek to interpret contracts to give effect to parties' expressed intent).

**¶15** The MOU describes the general purposes of release time. Noting the benefits of "harmonious and cooperative relationships between the City and its employees," the MOU states that the full-time release positions, and release hours, afford "an efficient and readily available point of contact for addressing labor-management concerns." 2012-2014 MOU § 1-3(B). Examples of how officers spend release time include representing Unit 4 officers "in administrative investigations and grievance/disciplinary appeal meetings with management; participating in collaborative labor-management initiatives . . . ; serving on Police Department task forces and committees; facilitating effective communication between City and Department management and unit employees; assisting unit members in

understanding and following work rules; and administering the provisions of the [MOU]." *Id.*

**¶16** The MOU also identifies various rights and obligations with respect to release time. For example, the use of paid release hours is subject to "Departmental operational and scheduling factors," and requires at least twenty-four hours written advance notice. *Id.* § 1-3(B)(3)(c). Release hours must be used for "legitimate [PLEA] business." *Id.* § 1-3(B)(3). The full-time release positions must be filled by full-time, sworn officers who "will at all times remain qualified to perform" normal police duties and who remain bound by "the City's and the Police Department's rules, regulations, and operations orders[.]" *Id.* § 1-3(B)(1). All Unit 4 officers are entitled to have PLEA serve as their meet and confer representative under the City Code and to be represented by PLEA concerning grievances and other matters relating to employment rights and obligations. *Id.* § 1-4(A), (B).

**¶17** It is not unusual for collective bargaining agreements to include provisions requiring employers to pay certain employees for time spent on union activities. As noted earlier, Phoenix has included provisions for release time in its MOU for Unit 4 for decades. The City's Meet and Confer Ordinance has provisions similar to those of the federal National Labor Relations Act with regard to the right of employees to bargain collectively with respect to "wages, hours, and working conditions." *Compare* Phx. City Code Art. XVII § 2-214(B) *with* 29 U.S.C. § 158(d). Federal courts have recognized that employer payments for time spent by employees during working hours on certain union activities, such as handling grievances or negotiating with the employer, are a mandatory subject of collective bargaining because such payments relate to the employees' "wages, hours, and other terms and conditions of employment." *See NLRB v. BASF Wyandotte Corp.*, 798 F.2d 849, 852-53 (5th Cir. 1986); *Axelson, Inc. v. NLRB*, 599 F.2d 91, 95 (5th Cir. 1979); *cf. Int'l Ass'n of Machinists & Aerospace Workers v. BF Goodrich Aerospace Aerostructures Grp.*, 387 F.3d 1046, 1055-56 n. 13 (9th Cir. 2004) (noting disagreement among federal courts whether Labor Management Relations Act allows full-time release payments as distinct from paid time off for union duties).

**¶18** That the release time provisions at issue here are part of the negotiated compensation package between the City, PLEA, and the Unit 4 officers is the beginning but not the end of our analysis. The lower courts, and Taxpayers, erroneously characterized the $1.7 million value of the

release time merely as a "payment to PLEA" which must be assessed relative to what the MOU "obligated PLEA to provide the City in return." *Cheatham*, 238 at 75 ¶ 20, 356 P.3d at 820. To be sure, PLEA benefits from the City's agreement to pay officers for time (some full-time) spent on behalf of PLEA. But the release time provisions must be assessed in light of the entire MOU, including the obligations imposed not only on PLEA but also on the employees for whom it is the authorized representative. Doing otherwise would conflict with the requirement that courts adopt a "panoptic view" of the transaction in assessing Gift Clause challenges.

¶19 We also reject PLEA's argument that the release time provisions are not subject to Gift Clause scrutiny because they are part of the compensation package negotiated on behalf of the Unit 4 officers. That a public entity is making payments to employees (here, payments for time spent on union-related activities) pursuant to a collective bargaining agreement does not necessarily obviate the concerns underlying the Gift Clause. Public funds conceivably could be expended for private purposes or in amounts grossly disproportionate to the benefits received even under a collective bargaining agreement. Accordingly, we turn to our usual Gift Clause analysis in evaluating Taxpayers' challenge to the release time provisions. *Cf. Turken*, 223 Ariz. at 346 ¶ 10, 224 P.3d at 162 (noting that Gift Clause seeks to prevent subsidies of private interests putatively serving quasi-public purposes).

## C.

¶20 Taxpayers argue that the release time provisions do not serve a public purpose because they "foster or promote the purely private or personal interests" of PLEA. *Cf. Kromko*, 149 Ariz. at 321, 718 P.2d at 480 (analyzing public purpose before assessing adequacy of consideration) (emphasis omitted).

¶21 In determining whether a transaction serves a public purpose, courts consider the "reality of the transaction" and not merely "surface indicia of public purpose." *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357. This inquiry, however, must reflect appropriate deference to the governmental entity that has considered and approved the transaction. "[W]e have repeatedly emphasized that the primary determination of whether a specific purpose constitutes a 'public purpose' is assigned to the political branches of government, which are directly accountable to the public." *Turken*, 223 Ariz. at 165 ¶ 28, 224 P.3d at 349. For Gift Clause purposes, a

public purpose is lacking "only in those rare cases in which the governmental body's discretion has been unquestionably abused." *Id.* (internal quotation marks and citations omitted).

¶22        Consistent with these principles, we have found the existence of a public purpose in various situations. *See id.* at 348 ¶ 23, 224 P.3d at 164 (finding that the purchase of parking spaces constituted a public purpose); *City of Glendale v. White*, 67 Ariz. 231, 240, 194 P.2d 435, 441 (1948) (finding that city acted with a public purpose when it joined the Arizona Municipal League); *Humphrey v. City of Phoenix*, 55 Ariz. 374, 387, 102 P.2d 82, 87 (1940) (finding that slum clearance program served public purpose).

¶23        The MOU, including its release time provisions, serves a public purpose. It procures police services for the City. Furthermore, the City Council recognized that the MOU identifies PLEA as the authorized representative of Unit 4 officers with whom the City can deal on all labor-related matters; under the MOU and the City's ordinance, PLEA is obliged to represent and serve all Unit 4 officers, whether or not they are PLEA members. Moreover, the City benefits from more efficient negotiations because it collectively negotiates with PLEA, rather than with individual employees.

¶24        Such provisions obviously may benefit the officers who, collectively, have chosen PLEA as their representative in dealings with their employer (one officer testified that he views the release time provisions as analogous to insurance benefits). The provisions, even considered in isolation, also benefit the City insofar as they are a benefit offered to current or prospective employees and they can facilitate the resolution of grievances and other employee-employer issues under the City's Meet and Confer Ordinance. *Cf. Int'l Ass'n of Machinists & Aerospace Workers*, 387 F.3d at 1057-58 (recognizing, for purposes of federal labor laws, that employer-paid union "shop steward" provides services that "benefit union and corporation alike").

¶25        The dissent, like the trial court, concludes that release time does not serve a public purpose but instead benefits PLEA as a "private entity." *Infra* ¶¶ 46, 51. But this position views the release time benefits in isolation rather than as part of the MOU as a whole, which provides police services to the public. *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357 ("panoptic view" required). This also views too narrowly both the role of public

employee unions and the public's interest. PLEA, as the authorized representative chosen by a majority of Unit 4 officers, serves not only its own interests, but also those of its members. While the City may sometimes be in an adversarial role relative to the union (sitting across the table, so to speak, in labor negotiations or employment-related disputes), the City – as its own ordinance recognizes – may also benefit as an employer by having an identified representative of the Unit 4 officers for employment-related issues. *See* Phx. City Code Art. XVII § 2-209 ("It is also the purpose of this ordinance to promote the improvement of employer-employee relations" by recognizing public employees' right to be represented by an organization of their choosing in their "employer-employee dealings with the City"). Further, as a governmental entity, the City has interests broader than a private employer based on "the unique fact that the public employer was established by and is operated for the benefit of all the people . . . ." Phx. City Code Art. XVII § 2-209(4).

**¶26**        Moreover, it is well established that labor unions, which have existed in the United States for over two hundred years, generally work to advance the employment interests of represented employees. *See, e.g.*, Charles B. Carver, *The Impact of Labor Unions on Worker Rights and on Other Social Movements*, 26 ABA J. Lab. & Emp. L. 267, 269-70 (2011). Contrary to the dissent's contention, a public purpose may be served by PLEA's representational activities to the extent they promote improved labor relations and employment conditions for public safety officers. Phx. City Code Art. XVII § 2-209(1) ("The people of Phoenix have a fundamental interest in the development of harmonious and cooperative relationships between the City government and its employees.").

**¶27**        The City Council did not abuse its discretion in concluding that the MOU, including the release time provisions, serves a public purpose by specifying the "wages, hours, and working conditions" for Unit 4 officers, recognizing the role of PLEA as the officers' authorized representative, and by providing, as part of the aggregate compensation, that certain officers will be paid for release time spent on behalf of PLEA.

**D.**

**¶28**        Because we hold that the MOU serves a public purpose, we next examine whether the consideration paid by the City under that agreement is grossly disproportionate to the benefits the City receives.

**¶29** Consideration is a "performance or return promise" that is bargained for in exchange for the other party's promise. *Schade v. Diethrich*, 158 Ariz. 1, 8, 760 P.2d 1050, 1057 (1988) (citing Restatement (Second) of Contracts § 71 (Amer. Law Inst. 1981)). Although courts do not normally scrutinize the adequacy of consideration between parties contracting at arm's length, we appropriately examine consideration when analyzing a contract under the Gift Clause "because paying far too much for something effectively creates a subsidy from the public to the seller." *Turken*, 223 Ariz. at 350 ¶ 32, 224 P.3d at 166.

**¶30** In analyzing the adequacy of consideration, courts also adopt a "panoptic view" of the transaction. *See id.* at 352 ¶ 47, 224 P.3d at 168 (noting that *Wistuber*'s language "was thus meant to reject an overly technical view of the transaction"); *State v. Nw. Mut. Ins. Co.*, 86 Ariz. 50, 54, 340 P.2d 200, 202 (1959) (using term "panoptic" in rejecting contention that a mutual insurance company's return of excess premiums to its members, including a school district, established that the initial premium payments violated the Gift Clause). Such an approach is particularly appropriate with respect to a collective bargaining agreement, which is not merely an exchange of discrete promises, but instead is "a long-term relational contract" governing the whole employment relationship. *Int'l Union of Operating Eng'rs, Local 139, ALF-CIO v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 746 (7th Cir. 2004); *see Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 312 (1989).

**¶31** Thus, when considering a Gift Clause challenge to provisions of a collective bargaining agreement, we cannot consider particular provisions in isolation. For example, if such an agreement provided for paid vacation or personal leave time for public employees, the adequacy of the consideration received by the employer would not be evaluated by asking if the employees must use their time in a way that benefits the employer. In that situation, the consideration received by the employer is the work the employees generally agree to provide under the agreement, not only during their paid leave or vacation times.

**¶32** Our analysis therefore recognizes that the MOU is an agreement between not only the City and PLEA but also the Unit 4 officers, who approved and are bound by its terms. Even if PLEA is viewed as the primary beneficiary of the release time provisions, in gauging whether the City has received consideration for those provisions it is necessary to

consider what the Unit 4 officers have agreed to do – to work under the wages, hours, and conditions specified in the MOU – in exchange for the compensation package (which includes the release time provisions). This reflects the general contractual principle that one party's performance (here, the City's agreement to pay release time) may be supported by "consideration" in the form of performance or a return promise by either the promisee (arguably PLEA) or another person (the Unit 4 officers). *See* Restatement (Second) of Contracts § 71(4), cmt. e (Amer. Law Inst. 1981); *cf. Turken*, 223 Ariz. at 350 ¶ 33, 224 P.3d at 166 (relying on contract law to conclude that anticipated indirect benefits, when not bargained for as part of the contracting party's performance, are not consideration for Gift Clause purposes).

**¶33** The City's payments for release time are supported by consideration both in terms of PLEA's obligations under the MOU and the City Code as the employee's authorized representative and the agreement by the Unit 4 employees to work under the terms and conditions of the MOU. There is no contention that the $660 million the City pays under the MOU is grossly disproportionate to the services to be provided by police officers. Viewed in the context of the MOU overall, the $1.7 million for release time payments is not "grossly disproportionate," *Turken*, 223 Ariz. at 350 ¶ 35, 224 P.3d at 166, to the value of what PLEA and the Unit 4 officers have agreed to provide in return.

**¶34** The dissent twice observes that there is no showing that absent release time, the City would be unable to employ police officers. *Infra* ¶¶ 47, 52. But the same could be said about various forms of benefits ranging from vacation time to life insurance. The pertinent issue for a Gift Clause analysis is not whether a particular expenditure is the only way to achieve a public purpose, but instead whether a comprehensive examination of the agreement reveals that the expenditure is grossly disproportionate to the benefit the public receives. *Turken*, 223 Ariz. at 350 ¶ 35, 224 P.3d at 166.

**¶35** In applying the "consideration" prong of the Gift Clause, just as in assessing "public purpose," courts must give due deference to the decisions of elected officials. "The Gift Clause is violated when [the] consideration, compared to the expenditure, is 'so inequitable and unreasonable that it amounts to an abuse of discretion.'" *Id.* at 349 ¶ 30, 224 P.3d at 165 (quoting *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357). The

Taxpayers have the burden of proving gross disproportionality of consideration, *Wistuber*, 141 Ariz. at 350, 687 P.2d at 358, and they have not met that burden here.

¶36        Our decision in *Wistuber* is not to the contrary.  The court of appeals cited *Wistuber* in holding that the MOU's release time provisions lacked consideration.  238 Ariz. at 75 ¶ 20, 356 P.3d at 820.  In that case, this Court upheld a provision in a school district's collective bargaining agreement providing release time for a teacher who was the president of the teacher's association.  The contract provisions specified how the teacher would spend her release time.  In rejecting a Gift Clause challenge, *Wistuber* noted that "the duties imposed upon [the association's president] are substantial, and the relatively modest sums required to be paid by the District [were] not so disproportionate as to invoke the constitutional prohibition."  141 Ariz. at 350, 687 P.2d at 358.  Here, the court of appeals noted that, "[u]nlike the detailed, mandatory contractual provisions upheld in *Wistuber*," the MOU does "not obligate PLEA to provide any specific duty in exchange for release time." *Cheatham*, 238 Ariz. at 75 ¶¶ 20, 22, 356 P.3d at 820.

¶37        *Wistuber*, however, did not hold that, as a general proposition, release time provisions can only be upheld if they impose specific duties on the employees involved.  Nor does *Wistuber* stand for the proposition that in evaluating the adequacy of consideration for benefits (such as release time) afforded under a collective bargaining agreement, a court should consider only the performance by the authorized representative, exclusive of the represented employees.

¶38        Moreover, the court of appeals and the trial court erred as a matter of law insofar as they construed the MOU as not limiting how officers can use release time.  *Cf. Powell v. Washburn*, 211 Ariz. 553, 555 ¶ 8, 125 P.3d 373, 375 (2006) (noting that contractual interpretation generally is a matter of law).  Collective bargaining agreements, like other contracts, should be construed to avoid making their provisions illusory. *Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Hatco, Inc.*, 142 Ariz. 364, 367, 690 P.2d 83, 86 (App. 1984).

¶39        The MOU here, particularly when construed in light of the City Code provisions, clearly contemplates that release time will be used for activities related to PLEA's role as the authorized representative for the

Unit 4 officers, even if it does not specify minutely how release time will be used. (This includes the provision affording release time for a legislative representative, who is "to work with and assist the [C]ity's legislative lobbyist." 2012-2014 MOU § 1-3(C).)

**¶40** We accordingly disagree with the dissent in its characterizing the use of release time as "almost unchecked." Nor is the dissent right to contend that release time involves "diverting officers from safeguarding the public." *Infra* ¶ 46. The MOU acknowledges that the costs to the City associated with release time were in lieu of wages and benefits; had the release time provisions been omitted, the officers might have received other benefits under the compensation package, such as personal time or paid vacation time. Notably, after the trial court enjoined the use of release time under the 2012-2014 MOU, the City agreed that the remaining release time would be allocated to police officers as additional vacation time. Thus, while it is true that particular officers will not be engaged in their usual police duties while using release time, it is incorrect to suggest that the MOU, by including release time, reduces total on-the-job time by Unit 4 officers. (The MOU also requires officers to obtain approval to absent themselves from duties to use release time and such approval is "subject to Departmental operational and scheduling factors." 2012-2014 MOU § 1-3(B)(3)(c).)

**¶41** Nor is our conclusion affected by Taxpayers' arguments that release time under prior MOUs was used in some instances for reasons unrelated to PLEA's representational role. Even if those assertions are correct (an issue we do not reach), the improper use of release time would not establish that the MOU violates the Gift Clause (just as the prospect of a breach does not mean a contract is contrary to public policy or lacks consideration), but instead that the Unit 4 officers or the City might have reason to complain of PLEA's violation of the collective bargaining agreement. *See id.* § 1-5(F) (noting that penalties, pursuant to the City Code, may be assessed against PLEA for breach of obligations); *see also Vaca v. Sipes*, 386 U.S. 171, 195 (1967) ("The appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach."). Although one could reasonably argue that greater specificity regarding the use of release time would better serve the City – and perhaps the Unit 4 officers themselves – such issues of labor-management relations should be decided through the collective bargaining process rather than dictated by the courts under the guise of the Gift Clause.

**¶42** We also reject Taxpayers' assertion that our decision in *Turken* establishes that the release time provisions violate the Gift Clause. In *Turken*, we held that the City's agreement to pay a developer as much as $97.4 million for the use of garage parking spaces in a mixed-use project likely violated the Gift Clause. 223 Ariz. at 350-51 ¶¶ 40-43, 224 P.3d at 166-67. Our opinion clarified that indirect benefits, when "not bargained for as part of the contracting party's promised performance," do not satisfy the "consideration" prong of the Gift Clause analysis. *Id.* at 350, ¶ 33, 224 P.3d at 166. In this respect, *Turken* is inapposite because here the consideration received by the City is not indirect benefits, but instead the obligations the MOU itself imposes on both PLEA and the Unit 4 officers.

**¶43** Finally, we note the limits of our holding. Our conclusion that the release time provisions do not violate the Gift Clause reflects our consideration of the MOU in its entirety, viewed in light of the City's Meet and Confer Ordinance. From this perspective, we cannot find that the City Council abused its discretion in determining that the MOU, including its release time provisions, serves a public purpose and that the City's payments are reasonable in light of the benefits it receives. We do not comment on the desirability of such provisions as a matter of labor relations or public policy. Nor do we address Taxpayers' arguments, which were not raised in the trial court, that the release time provisions violate either the "right to work" provisions of article 25 of the Arizona Constitution and A.R.S. §§ 23-1301 through 1307 or the First Amendment rights of non-PLEA members.

## IV.

**¶44** Because the challenged release time provisions do not violate the Gift Clause, we reverse the trial court's judgment and entry of a permanent injunction and vacate the opinion of the court of appeals.

TIMMER, J., joined by BRUTINEL, J., dissenting.

¶45        By permitting the City to subsidize PLEA simply because the release time terms are tucked within a collective bargaining agreement, the majority undercuts the Gift Clause's aim "to prevent governmental bodies from depleting the public treasury by giving advantages to special interests . . . or by engaging in non-public enterprises." *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357. I respectfully dissent.

¶46        The substantial benefits bestowed on PLEA are allowable under the Gift Clause only if they serve a public purpose. *See Turken*, 223 Ariz. at 345 ¶ 7, 224 P.3d at 161. No public purpose is served by diverting officers from safeguarding the public to work almost unchecked for PLEA. The City has no control over how PLEA directs the officers on release time and is not even told what the officers do for PLEA. *Cf. Kromko*, 149 Ariz. at 321, 718 P.2d at 480 (stating that "the fear of private gain or exploitation of public funds envisioned by the drafters of our constitution" is absent when private entity's operation of public hospital is subject to the control and supervision of public officials). As a testifying labor expert put it, "[PLEA officials] are given a blank check to do . . . as they determine is appropriate to meet the needs of their organization." Officers on release time can lobby the legislature for and against laws that interest PLEA and its members, campaign for elected officials who support PLEA, attend PLEA functions, manage PLEA elections, and engage in any activities that promote PLEA's private interests, even if it is to the City's detriment. While these activities may benefit officers and certainly benefit PLEA, they do not serve a public purpose. *Cf. Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200, AFL-CIO*, 611 F.3d 483, 486 (9th Cir. 2010) ("After all, the very purpose of labor unions is to advocate zealously for their members.").

¶47        The majority finds that the release time provisions serve a public purpose because they are set forth in the MOU, which in turn serves the public by enabling the City to hire and collectively negotiate with Unit 4 officers. *See supra* ¶¶ 23, 25. In my view, the majority conflates the public purpose served by securing City employees through collective bargaining with the public purpose served by the terms reached through such efforts. The City may derive some benefits from negotiating with Unit 4 officers through a single representative rather than by negotiating with individual officers. But the public benefit resulting from collective bargaining does not mean that the release time provisions agreed to through that process

17

necessarily serve a public purpose. If that were so, public entities could easily circumvent the Gift Clause simply by placing a gift within a collective bargaining agreement. And nothing suggests that PLEA would not have negotiated an MOU for Unit 4 officers absent those provisions. Why else would officers pay approximately $1.7 million in annual dues to PLEA to represent them in determining wages, hours, and working conditions if not for PLEA to negotiate on their behalf?

¶48        The majority's stronger argument is that the release time provisions promote a public purpose by serving as a component of the compensation package for Unit 4 officers. *See supra* ¶ 24. The majority emphasizes that the City originally allocated $660 million for Unit 4 officer compensation before negotiating with PLEA to use a "chunk" of that money for release time. *See supra* ¶ 14. A City negotiator testified that this "chunk" was "costed" against the compensation package as a whole, and if it was not used for release time, it would be folded back into the compensation package. As the City had included release time provisions in its MOUs since 1977, however, it is hardly surprising that it built release time moneys into its Unit 4 allocation. Nothing indicates that the City would have allocated $660 million for Unit 4 officers if release time was off the table. Indeed, before negotiations for the 2010-2012 MOU commenced, the police department suggested to City negotiators that "[a] reduction in cost of City funded PLEA operations" would "increas[e] funds available for mission-critical functions;" the department did not suggest that a reduction would free up money to increase officer benefits.

¶49        Other evidence supports the trial court's finding that the MOU provisions were negotiated individually and "not as a total package offered to Unit 4 with those members being allowed to divide it how they wished." *See Shooter v. Farmer*, 235 Ariz. 199, 200 ¶ 4, 330 P.3d 956, 957 (2014) ("We defer to the trial court's findings of fact unless they are clearly erroneous."). City Councilman Sal DiCiccio testified that the MOU provisions were "separately negotiated" rather than as part of a "total package." The MOU does not require that unused release time be paid to officers. And release time cannot be accurately "costed" to officers' salaries because a large amount of release time – representation hours – are unlimited. Tellingly, after the court preliminarily enjoined the release time provisions in the 2010-2012 MOU, the City did not use the funds designated for release time under that MOU to compensate Unit 4 officers. (After the court found that release time is not compensation, in part because the City

did not treat it as such after the preliminary injunction, and entered the permanent injunction, the City and PLEA amended the 2012-2014 MOU to provide additional vacation time to officers equaling the number of unused release time hours. This belated act does not vitiate the evidence before the court at the time of its ruling that the City did not treat release time as compensation.).

**¶50** The majority cites language in the MOU providing that release time is funded "in lieu of wages and benefits." *See supra* ¶ 14. Declaring this does not make it so. If we look no further than a self-serving contractual provision, private subsidies could escape Gift Clause scrutiny whenever the parties agree that subsidies are "compensation." *Cf. Wistuber*, 141 Ariz. at 349, 687 P.2d at 357 (stating that in determining the existence of a public purpose, the court should consider the "reality of the transaction" and not just the "surface indicia of public purpose").

**¶51** Even if the money designated for release time would have otherwise been paid to officers, it does not necessarily follow that release time serves a public purpose as "compensation." Following the majority's logic, the City could compensate officers by giving money to a private business to establish a coffee house near a police station for the officers' enjoyment. If "public purpose" can be stretched this far, the Gift Clause, at least in the public employment context, has met its end.

**¶52** The majority characterizes my position as positing that release time benefits violate the Gift Clause because they benefit a private organization. *See supra* ¶ 25. Not true. Payments to a private entity to provide benefits to public employees undoubtedly can serve a public purpose by providing an incentive for public employment. Benefits such as health insurance, gym memberships, and emergency child care for employees fall within this category. Without attempting to precisely define what payments to private entities constitute employee compensation for Gift Clause purposes, at a minimum, such payments must substitute for the moneys an employee would otherwise pay for the benefit provided directly to the employee by the third party. Thus, payments to PLEA to represent an officer in grievance proceedings could be compensation because the officer would otherwise have to pay money to hire a representative. But when public resources given to a private entity can be used for any purpose directed by the entity, as here, and the public expenditure does not

substitute for an expense the employee would otherwise pay, that expenditure cannot be considered compensation.

¶53        Alternatively, I agree with the trial court and the court of appeals that the release time provisions violate the Gift Clause because the City does not receive sufficient consideration in return for its $1.7 million outlay.  *Cf. Turken*, 223 Ariz. at 345 ¶ 7, 224 P.3d at 161 (stating that to comply with the Gift Clause, a governmental entity must receive consideration in return for expenditure that "is not so inequitable and unreasonable that it amounts to an abuse of discretion") (citation and internal quotation marks omitted).  Whether the City receives sufficient consideration turns on "the objective fair market value" of what PLEA promised to provide.  *See id.* at 350 ¶ 33, 224 P.3d at 166.  The record does not reflect such a value.  Indeed, the City lacks a mechanism to quantify the value of benefits it receives from the release time provisions.

¶54        I cannot see how any value the City receives from the release time provisions approaches a fair market value of $1.7 million.  The MOU does not obligate PLEA to provide any services to the City.  Any promotion of employer-employee relations, *see supra* ¶ 25, fostered by the release time provisions are indirect benefits that cannot constitute consideration.  *Cf. id.* (rejecting assertion that "indirect benefits" constitute consideration).  The majority concludes that Unit 4 officers' agreement to work as police officers in exchange for a compensation package that includes release time provisions is sufficient consideration.  *See supra* ¶ 32.  Because I agree with the courts below that the extensive benefits given to PLEA do not serve as officer compensation, I likewise reject the majority's reasoning here.  Nothing in the record suggests that the City could not employ police officers without subsidizing PLEA with release time benefits.  And any release time that could be compensation, for example, time used to represent officers in grievance proceedings, has neither been quantified nor assigned a monetary value.

¶55        To subsidize a labor organization under the guise of employee compensation violates the Gift Clause.  That is what has occurred here.  In light of the lack of any contractual assurance that PLEA release time actually serves a public purpose, this generous benefit cannot be considered anything other than a gift to PLEA prohibited by the Gift Clause.  I would uphold the trial court's injunction.