NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

DARCIE SCHIRES, et al., *Plaintiffs/Appellants*,

*v.*

CATHY CARLAT, et al., *Defendants/Appellees*.

No. 1 CA-CV 18-0379
FILED 1-23-2020

---

Appeal from the Superior Court in Maricopa County
No. CV2016-013699
The Honorable Sherry K. Stephens, Judge

**AFFIRMED**

---

COUNSEL

Scharf-Norton Center for Constitutional Litigation, Phoenix
By Christina Sandefur, Veronica Thorson
*Counsel for Plaintiffs/Appellants*

Office of the City Attorney, Peoria
By Vanessa Hickman, Melinda A. Bird
*Co-counsel for Defendants/Appellees*

Osborn Maledon, P.A., Phoenix
By Mary R. O'Grady, Shane M. Ham, Nathan T. Arrowsmith
*Co-counsel for Defendants/Appellees*

Christina Estes-Werther, Phoenix
*Counsel for Amici Curae League of Arizona Cities and Towns and City of Phoenix*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Chief Judge Peter B. Swann joined. Presiding Judge James B. Morse Jr. dissented.

---

**H O W E**, Judge:

¶1        Darcie Schires, Andrew Akers, and Gary Whitman (collectively "Taxpayers") appeal from the trial court's grant of the City of Peoria's motion for summary judgment and denial of their motion for summary judgment. The trial court ruled that Peoria's payments to Huntington University ("HU") and Arrowhead Equities LLC ("Arrowhead") pursuant to agreements Peoria entered into with those entities did not violate the Gift Clause of the Arizona Constitution because the expenditures were for a public purpose and because Taxpayers failed to meet their burden of establishing gross disproportionality. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        In 1994, the Arizona Legislature enacted legislation that allows cities and towns to utilize financial incentives to promote economic development within their boundaries. *See* A.R.S § 9–500.11(A) (2019).[1] In

---

[1]        There are two versions of A.R.S. § 9–500.11. The shorter version of the statute is entitled "Expenditures for economic development; definitions," and has four sections, A–D. This version applies to economic development activities generally. Throughout this litigation the parties

2010, pursuant to section 9–500.11, the Peoria City Council adopted an Economic Development Implementation Strategy ("EDIS"), which identified "business activities and industries desirable to the City," and authorized the "creation and implementation of an economic development incentive and investment program that sets forth in detail the types of public incentives and investments that the City is authorized and willing to make . . . in furtherance of retaining existing businesses and attracting certain targeted businesses and industries identified in the EDIS as desirable to Peoria."

¶3            Following the creation of an Economic Development Incentive and Investment Policy ("EDIIP"), the City Council adopted the EDIIP, which identified the targeted industries that Peoria wished to attract. Those industries included industries involving "the utilization of high technology or innovative new technologies" and "higher education." The EDIIP set out minimum project qualifications for projects Peoria would invest in. For instance, to be considered for incentives under the EDIIP, a project must have a minimum capital investment of $250,000, create at least ten full-time jobs with average salaries of $50,000 per year with benefits, and "economically reposition unused or underutilized properties."

¶4            Peoria was also interested in attracting development of the area between Loop 101 and Bell Road, "the P83 District." In addition to adopting an EDIS and EDIIP, Peoria adopted the P83 Program, a program designed to "encourage a more diverse use of existing vacant buildings in the (P83) District . . . ." Under the P83 Program, eligible property owners could apply for a matching funds grant from Peoria for interior tenant improvements "upon acceptable performance." Any property owner who failed to comply with the program's terms would forfeit the outstanding grant balance, and any property owner who failed to remain in full operation for the term of the grant would be required to repay Peoria all funds received under the program.

¶5            In 2012, Peoria began negotiating with HU, a "fully accredited, nationally recognized" four-year private Christian university in

---

have referred to this version of § 9–500.11. The longer version of § 9–500.11, entitled "Expenditures for economic development; requirements; definitions," has thirteen sections, (A)–(M). This version establishes requirements for retail tax incentive agreements and is not applicable to this case, which involves direct payments (rather than tax incentives) to two businesses not engaged in retail sales.

Indiana, to persuade it to open a branch campus in Peoria. In 2015, HU proposed bringing an undergraduate digital media arts program to Peoria. Peoria retained an economic and real estate consulting firm to analyze how a branch campus would economically and fiscally affect Peoria. The study concluded that an agreement with HU would have an economic impact of $15,663,860 on Peoria and its surrounding areas over the first five years of the agreement.

¶6        The City Council approved entering into an agreement with HU in July of 2015, which was amended in 2016. Under the HU agreement, Peoria agreed to provide financial incentives to HU over a three-year period after HU opened and operated a campus in Peoria. The agreement required HU to achieve detailed performance thresholds before receiving any payments. The performance thresholds required, among other things, obtaining approvals from various regulatory agencies, entering into a long-term lease with Arrowhead for a facility owned by Arrowhead in the P83 district, and enrolling a minimum number of students for in-person (not online) coursework in the digital media arts program. The first performance threshold (to be achieved in the first academic year), required HU to appoint campus leadership and submit to Peoria "a University-approved and funded faculty and staff plan." The agreement also required HU not to engage in any similar project with any other Arizona municipality for seven years and to participate in "economic development activities" with Peoria. The agreement required HU to contribute $2.5 million to the development of the Peoria campus in the first three years. The maximum amount of reimbursements available to HU under the agreement if it met the performance thresholds was $1,875,000.

¶7        The HU agreement stated that "[the] City has concluded that the Project [developing the HU Peoria campus] will benefit the public interest and promote the public welfare of the citizens in the City and that the City and its residents will receive an equitable or proportional economic return in exchange for the incentives that will be provided by the City under this Agreement . . . ."

¶8        HU then entered into a lease with Arrowhead for a facility in the P83 district. As a result, Arrowhead applied for a grant under the P83 program in 2016. Peoria approved the grant request and entered into an agreement with Arrowhead. Under the agreement, Peoria agreed to reimburse Arrowhead over several years for the tenant improvement expenses it would incur in converting its property for HU's use. The maximum amount Peoria agreed to reimburse Arrowhead was $737,596. HU opened its doors in Peoria in fall of 2016. The parties do not dispute

that HU would not have opened a campus in Peoria if not for the HU agreement. HU "ultimately received the full amount of the funding [from Peoria] to develop and operate the HU campus."

**¶9** This litigation began in October 2016 when Taxpayers filed a complaint against Peoria, its mayor, and members of its City Council seeking to enjoin Peoria from making any payments to HU and Arrowhead. After Taxpayers filed their complaint, Peoria hired a second expert, Bryce Cook, who concluded that the economic impact of the Arrowhead and HU agreements "on zip codes within the City of Peoria" was $11.3 million. Taxpayers' expert opined that the value of the agreements was zero.

**¶10** The parties filed cross motions for summary judgment. After oral argument, the court granted Peoria's motion and denied Taxpayers' motion. Taxpayers timely appealed.

## DISCUSSION

**¶11** Taxpayers argue that the HU and Arrowhead agreements violate the Gift Clause of the Arizona Constitution because the expenditures Peoria was obligated to make under the agreements do not serve a public purpose and the consideration Peoria will receive in exchange for its payments is grossly disproportionate. We review the interpretation and application of constitutional provisions de novo. *Cheatham v. DiCiccio*, 240 Ariz. 314, 318 ¶ 8 (2016). We review the trial court's grant of summary judgment de novo "to determine whether any genuine issues of material fact exist and whether the trial court correctly applied the law." *Urias v. PCS Health Sys., Inc.*, 211 Ariz. 81, 85 ¶ 20 (2005). We review the facts and inferences drawn from the facts in the light most favorable to the party against whom judgment was entered. *Korwin v. Cotton*, 234 Ariz. 549, 554 ¶ 8 (App. 2014).

**¶12** The Gift Clause of the Arizona Constitution provides in relevant part that "[n]either the state, nor any county, city, town, municipality, or other subdivision of the state shall ever . . . make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation . . . ." Ariz. Const. art. 9, § 7. The Gift Clause's purpose is "to prevent governmental bodies from depleting the public treasury by giving advantages to special interests or by engaging in non-public enterprises." *Wistuber v. Paradise Valley Unified Sch. Dist.*, 141 Ariz. 346, 349 (1984) (internal citations omitted). A government expenditure will be upheld if (1) it has a public purpose and (2) the consideration the governmental entity receives "is not grossly disproportionate to the amounts paid to the private

entity." *Cheatham*, 240 Ariz. at 318 ¶ 10 (citing *Turken v. Gordon*, 223 Ariz. 342, 345, 348 ¶¶ 7, 22 (2010)).

¶13 "In evaluating Gift Clause challenges, 'a panoptic view of the facts of each transaction is required,' and 'courts must not be overly technical and must give appropriate deference to the findings of the governmental body.'" *Id.* (quoting *Wistuber*, 141 Ariz. at 349). "[A]lthough determining whether governmental expenditures serve a public purpose is ultimately the province of the judiciary, courts owe significant deference to the judgments of elected officials." *Turken*, 223 Ariz. at 346 ¶ 14. We will "find a public purpose absent only in those rare cases in which the governmental body's discretion has been 'unquestionably abused.'" *Id.* at 349 ¶ 28.

### 1. Public Purpose

¶14 Taxpayers argue that the trial court erred in concluding that the agreements had a valid public purpose. They argue that the agreements primarily benefit HU and Arrowhead, both private businesses, and that "the public receives nothing from their operation." They further argue that Peoria's economic development efforts cannot have a public purpose because economic development is not a tangible public benefit. Taxpayers assert that the agreements do not guarantee even an indirect benefit to Peoria, noting that a similar venture Peoria entered into with another university failed in 2017 when that university closed down.

¶15 Peoria argues that the agreements do serve a valid public purpose because A.R.S. § 9–500.11(A) expressly allows municipal governments to "appropriate and spend public monies for and in connection with economic development activities." Peoria argues that it did not pay HU and Arrowhead just to operate their businesses, but rather it offered incentives to get HU and Arrowhead to take actions they otherwise would not take that would benefit Peoria's economy. Peoria further argues that economic development efforts have a public purpose regardless of their ultimate success or failure because they are intended to benefit the public and that Arizona law does not require that it receive a tangible, physical benefit from the agreements.

¶16 Arizona courts have taken an expansive view of public purpose. *See Turken*, 223 Ariz. at 348 ¶ 23 (purchase of parking spaces was a public purpose); *Indus. Dev. Auth. v. Nelson*, 109 Ariz. 368 (1973) (rejecting Gift Clause attack on public agency's issuance of industrial development bonds); *Town of Gila Bend v. Walled Lake Door Co.*, 107 Ariz. 545 (1971)

(finding public purpose in constructing a water line serving just one factory)); *City of Glendale v. White*, 67 Ariz. 231, 238 (1948) (city acted with a public purpose when joining municipal league); *Humphrey v. City of Phoenix*, 55 Ariz. 374, 387 (1940) (slum clearance program served a public purpose). "[T]he term 'public purpose' . . . changes to meet new developments and conditions of times[.]" *City of Glendale*, 67 Ariz. at 236. "Our cases therefore find public purposes in many contexts that might not have been familiar to our Constitution's framers." *Turken*, 223 Ariz. at 346 ¶ 13.

**¶17**       Peoria determined that bringing HU to Peoria would be "of great value to the city," and that the agreements here would serve multiple public purposes. Both agreements were entered into in accordance with Peoria's EDIS and EDIIP. *See supra* ¶¶ 3–4. Peoria cited public purposes for the agreements including promoting economic development and job growth, promoting educational opportunities in the STEM field, and repurposing an "unused or underutilized propert[y]" in the P83 District. The Arizona legislature expressly permits municipalities to spend public monies "for and in connection with economic development activities." A.R.S. § 9–500.11(A). Moreover, a public expenditure is not illegal just because a private entity will benefit from the expenditure. *Town of Gila Bend*, 107 Ariz. at 550. We cannot conclude that Peoria "unquestionably abused" its discretion in determining that the agreements had a public purpose.

## 2. Adequacy of Consideration

**¶18**       Taxpayers next argue that the agreements violate the Gift Clause because Peoria does not receive adequate consideration under the agreements. Even if an expenditure has a public purpose, the Gift Clause requires government entities to receive adequate consideration. *Turken*, 223 Ariz. at 345 ¶ 7. We do not normally scrutinize the adequacy of consideration between parties contracting at arm's length but we examine consideration when analyzing a contract challenged under the Gift Clause "because paying far too much for something effectively creates a subsidy from the public . . . ." *Id.* at 350 ¶ 32. "Consideration" is a "performance or return promise . . . bargained for . . . in exchange for the promise of the other party." *Schade v. Diethrich*, 158 Ariz. 1, 8 (1988) (citing Restatement (Second) of Contracts § 71 (2) (1981)). "Monetary gain is not always required as consideration." *Id.* (citation omitted). Any performance is consideration bargained for, but not the performance of a legal duty undisputedly owed. Restatement (Second) of Contracts §§ 72, 73 (1981).

**¶19**        In assessing the adequacy of consideration in the Gift Clause context, courts look at the fair market value of a private party's promise in return for a public entity's payment. *Turken*, 223 Ariz. at 350 ¶ 33. "When government payment is grossly disproportionate to what is received in return, the payment violates the Gift Clause." *Id.* at 348 ¶ 22. In applying the consideration prong of the Gift Clause analysis, just as in assessing public purpose, courts must give due deference to the decisions of elected officials. *Cheatham*, 240 Ariz. at 322 ¶ 35. We must also take a panoptic view of the transaction in assessing consideration rather than an overly technical view. *Id.* at 321–22 ¶ 30. "The Gift Clause is violated when the consideration, compared to the expenditure, is 'so inequitable and unreasonable that it amounts to an abuse of discretion.'" *Id.* at 322 ¶ 35 (quoting *Turken*, 223 Ariz. at 349 ¶ 35; *Wistuber*, 141 Ariz. at 349). Taxpayers have the burden of proving that consideration is grossly disproportionate. *See Cheatham*, 240 Ariz. at 322–23 ¶ 35 (citation omitted).

**¶20**        Taxpayers argue that the value of the HU contract is zero, not $11.3 million, because economic impact and "anticipated, indirect benefits" cannot be consideration under the Gift Clause. Taxpayers assert that Peoria receives nothing tangible from the Arrowhead agreement, so the value of that agreement is also zero.[2] Taxpayers point out that Peoria does not own the HU campus and its residents do not have open access to the campus or receive any services or other benefits from HU, unless they are accepted to HU and pay the full price of admission. At best, Taxpayers argue, any economic impact Peoria will receive because of the agreements would be an indirect benefit and therefore cannot constitute consideration.

**¶21**        Peoria argues that it received adequate consideration under the agreements because the value of what was promised—the HU campus in Peoria—is greater than the maximum potential amount owed under the agreements. Peoria argues that the economic impact of the HU campus will be a direct result of the promises made in the agreements rather than an indirect benefit. *See Turken*, 223 Ariz. at 350 ¶ 33 (stating that indirect benefits that are not bargained for are not consideration under contract law).

---

[2]        Taxpayers also argue that the estimated fiscal impact of the HU agreement ($206,630) is not consideration because fiscal impact was neither promised nor bargained for and would nevertheless be an amount grossly disproportionate to Peoria's expenditures. Peoria, however, does not argue that the projected fiscal impact of the agreements is adequate consideration.

**¶22** The value of the HU contract is not an indirect benefit, however, as Arrowhead and HU promised to open a Peoria campus of HU in the P83 district in exchange for reimbursements of up to $1,875,000 for the HU agreement and $737,596 for the Arrowhead agreement. Peoria's expert, Bryce Cook, opined that the appropriate way to measure the fair market value Peoria received from the agreements was to measure the economic impact of the campus within the Peoria's limits. Cook concluded that "the economic value of the promise to operate a branch campus of HU in the City of Peoria, including the promises to repurpose the building for the campus, is $11.3 million."

**¶23** Taxpayers argue that "economic impact" is not a proper measurement of the consideration Peoria will receive. Even if we do not accept that the value of the agreements was $11.3 million, however, the consideration Peoria received here for its $2.6 million payment was not indirect, nor was it grossly disproportionate. *See Cheatham*, 240 Ariz. at 324 ¶ 42. HU had the substantial obligation to develop and open a new campus in Peoria at a minimum cost of $2.5 million and to help Peoria with economic development activities; Arrowhead was obligated to convert a building in the P83 district into the campus. HU was also obligated to forbear from engaging in a similar project with *any* other Arizona municipality for seven years. *Cheatham* instructs that we must give due deference to the decision of Peoria's elected officials in assessing the adequacy of consideration and take a "panoptic view" of the agreements. *See Cheatham*, 240 Ariz. at 321–22 ¶¶ 30, 35. Here, Peoria determined that it would receive "an equitable or proportional economic return" in exchange for its payments pursuant to the agreements, which were the culmination of Peoria's EDIS, EDIIP, and P83 incentive programs outlined *supra* ¶¶ 2–4. We agree with the trial court's conclusion that Taxpayers have not met their burden of showing that the consideration here is grossly disproportionate.

**¶24** Because we find that the agreements have a public purpose and the consideration Peoria received was not grossly disproportionate, we hold that the agreements do not violate the Gift Clause.

### 3. Attorneys' Fees

**¶25** Taxpayers request costs and attorneys' fees pursuant to A.R.S. § 12–341, –348, and the private attorney general doctrine. *See Ariz. Ctr. for Law in the Pub. Interest v. Hassell*, 172 Ariz. 356, 371 (App. 1991). Because we affirm the decision of the trial court, we deny the request for attorneys' fees and costs.

**CONCLUSION**

¶26       For the foregoing reason, we affirm the decision of the trial court granting Peoria's motion for summary judgment and denying Taxpayers' motion for summary judgment.

**M O R S E**, Presiding Judge, dissenting:

¶27        I respectfully dissent.   The superior court erred when it considered indirect economic impact to determine adequate consideration under the Gift Clause.  Appellees concede that (i) "[t]he only evidence in the record assigning a value to what HU and Arrowhead promised under the agreements is the report of Bryce Cook," and (ii) Mr. Cook's analysis only "assess[ed] the potential economic impact of such a campus."  Perhaps implicitly recognizing the superior court's error, the majority pivots and argues that HU's obligation under the agreements to expend a minimum of $2.5 million on their campus provided sufficient consideration.  *Supra* ¶ 23. But this argument also fails because the amount spent by HU on its own facilities is not equal to the value of what Peoria receives, if anything, under the agreement.  Because neither the indirect economic benefits nor the amounts expended by HU or Arrowhead provide evidence of the direct benefits received by Peoria, the proper result would be to vacate and remand.

¶28        The Gift Clause of the Arizona Constitution is comprehensive and explicit.  Public entities are prohibited from making "<u>any</u> donation or grant, by subsidy or otherwise, to <u>any</u> individual, association, or corporation."  Ariz. Const. art. 9, § 7 (emphasis added).  The Gift Clause "was designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to quasi[-]public purposes, but actually engaged in private business."  *Turken*, 223 Ariz. at 346, ¶ 10 (quoting *Day v. Buckeye Water Conservation & Drainage Dist.*, 28 Ariz. 466, 473 (1925)).

¶29        Under the Gift Clause, payments from public entities to individuals, associations, or corporations are allowed only when the payment promotes a public purpose and the payment is not "grossly disproportionate to what is received in return."  *Turken*, 223 Ariz. at 348, ¶ 22.   Evaluation of adequacy of the consideration is necessary to distinguish between permissible payments made by a government for goods and services (*e.g.,* wages to government employees or fair market payments for gasoline to operate government vehicle) and impermissible donations and subsidies (*e.g.,* paying $97 million for parking spaces).  *See id.* at 351, ¶¶ 42-43.

¶30        Often, a government payment will generate extensive indirect benefits beyond the fair market value of the direct consideration received in exchange.  For example, repairing a sewage line may only cost $5,000 in parts and labor and may generate millions of dollars in improved health

11

and sanitation, but "paying far more than the fair market value for the repair plainly would be a subsidy," and the "potential for a subsidy is heightened when, as occurred here, a public entity enters into the contract without the benefit of competitive proposals." *Id.* at 350, ¶¶ 32, 34-35. This case is no different and the value of consideration given by HU and Arrowhead cannot be based on the only evidence presented to the superior court—the anticipated economic impact of the university. "Although anticipated indirect benefits may well be relevant in evaluating whether spending serves a public purpose, when not bargained for as part of the contracting party's promised performance, such benefits are not consideration." *Id.* at 350, ¶ 33.

¶31 As noted above, Appellees concede that Mr. Cook's report only assessed the economic impact of the campus and is the only evidence of value in the record below. Because our Supreme Court has held that potential economic impact is not consideration for purposes of the Gift Clause, *Id.* at 350, ¶ 33, Mr. Cook's report provides no relevant evidence of the value for a Gift-Clause analysis.

¶32 The majority attempts to address the problem of indirect benefits by finding that the promise of HU and Arrowhead to develop and open a Peoria campus is proper consideration and is sufficient for Peoria's payment of $2.6 million. The majority finds the value of this consideration to be adequate because HU promised to invest $2.5 million to develop and open the new campus and Arrowhead promised to make improvements to its property. *Supra* ¶¶ 22-23. Admittedly, under traditional contract principles, consideration is <u>any</u> promise that is bargained for, and therefore these promises to develop one's own property are consideration. *See Cheatham*, 240 Ariz. at 321, ¶ 29 ("Consideration is a 'performance or return promise' that is bargained for in exchange for the other party's promise.") (quoting *Schade*, 158 Ariz. at 8). However, the value of these promises under the Gift Clause cannot be determined based on the amount expended by HU and Arrowhead—the value of that consideration for Gift Clause purposes is "what the government receives under the contract." *Turken*, 223 Ariz. at 348, ¶ 22; *see also Cheatham*, 240 Ariz. 314, at ¶ 10 (providing that an expenditure will be upheld if "the consideration received by the government is not grossly disproportionate to the amounts paid to the private entity" (internal quotation marks omitted)); *Wistuber*, 141 Ariz. at 349 (referring to consideration alternatively as the "public benefit" and the "value to be received by the public").

¶33 Thus, the majority's analysis fails because HU's $2.5 million investment and the amount spent by Arrowhead on improvements to its

property do not equate to the direct benefits received by Peoria or the public from those expenditures.[3] A simple example illustrates this point. If the value of the consideration to Peoria could be measured solely by the value of the expenditure, then a city government could give $1,000,000 to a private entity in exchange for the entity's promise to pay $1,000,000 to its chief executive officer ("CEO"). Technically, this may be "consideration" under contract law because it is a bargained-for obligation, but the value of that consideration for purposes of the Gift Clause is limited to the value received by the city government, if any. The Gift Clause value of that consideration is not measured by the amount paid to the CEO.

**¶34**        The majority correctly notes that the agreements provide that HU will participate in economic development activities with Peoria and forgo similar deals with other Arizona municipalities.[4] *Supra* ¶ 23. These promises may also be consideration for the agreements, but no evidence was introduced below as to the fair market value of these promises to Peoria. It may be "difficult to believe" that value of the direct benefit to Peoria from HU's and Arrowhead's promises to develop and improve their own business interests, only deal with Peoria, and assist with economic development activity have a value to Peoria worth anything near the $2.5 million paid by Peoria. *See Turken*, 223 Ariz. at 351, ¶ 43. However, Peoria did not introduce any evidence below as to the fair market value of the direct benefits to be received by Peoria, if any, from these promises, and I would vacate and remand to allow the factfinder to apply the correct

---

[3]        It is notable that the agreements in this case do not provide that Peoria will receive ownership of the properties or improvements at the conclusion of the agreements. Thus, unlike other Gift-Clause cases, HU and Arrowhead will spend money on their own property and facilities, receive reimbursement from Peoria, and keep all ownership after the arrangement is complete. *Contra City of Tempe v. Pilot Properties, Inc.*, 22 Ariz. App. 356, 363 (1974) (noting that the city would receive title to the improvements built on the property at the conclusion of the lease); *Stuart v. Lane*, 1 CA-CV 15-0746, 2017 WL 3765499 at *4, ¶ 24 (Ariz. App. Aug. 31, 2017) (mem. decision) (finding adequate consideration where the city contributed $2.1 million for capital improvements, in exchange for increased fees, payments, and title to the improvements on expiration of the agreement).

[4]        This last promise was somewhat reciprocal as Peoria agreed for three years "to engage and/or financially support only those universities willing to collaborate and not compete with HU."

analysis and determine whether $2.5 million is grossly disproportionate to the direct public benefits received.



AMY M. WOOD • Clerk of the Court
FILED:  AA