IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**DARCIE SCHIRES, ET AL.,**
*Plaintiffs/Appellants*

*v.*

**CATHY CARLAT, ET AL.,**
*Defendants/Appellees.*

No. CV-20-0027-PR
**Filed February 8, 2021**

Appeal from the Superior Court in Maricopa County
The Honorable Sherry K. Stephens, Judge
No. CV2016-013699
**REVERSED AND REMANDED**

Memorandum Decision of the Court of Appeals
Division One
1 CA-CV 18-0379
Filed January 23, 2020
**VACATED**

COUNSEL:

Christina Sandefur (argued), Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Darcie Schires, et al.

Mary R. O'Grady (argued), Emma Cone-Roddy, Osborn Maledon, P.A., Phoenix; Vanessa Hickman, City Attorney, Amanda Sheridan, Senior Assistant City Attorney, Saman J. Golestan, Assistant City Attorney, Office of the City Attorney, City of Peoria, Peoria, Attorneys for Cathy Carlat, et al.

Mark Brnovich, Arizona Attorney General, Brunn (Beau) W. Roysden III, Solicitor General, Michael S. Catlett, Deputy Solicitor General, Dustin D. Romney, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae State of Arizona

Benjamin Nielsen, Quarles & Brady LLP, Phoenix, Attorneys for Amici Curiae Arizona Tax Research Association

Aditya Dynar, Dynar Law, PLC, Gilbert, Attorney for Amicus Curiae Americans For Prosperity Foundation - Arizona

Kory Langhofer, Thomas Basile, Statecraft, Phoenix, Attorneys for Amicus Curiae Public Integrity Alliance

Laura Conover, Pima County Attorney, Regina L. Nassen, Deputy County Attorney, Pima County Attorney's Office, Tucson, Attorneys for Amicus Curiae Pima County

Timothy J. Berg, Emily Ward, Taylor Burgoon, Fennemore Craig, P.C., Phoenix, Attorneys for Amicus Curiae Greater Phoenix Leadership, et al.

Christina Estes-Werther, General Counsel, The League of Arizona Cities and Towns, Phoenix, Attorneys for Amicus Curiae The League of Arizona Cities and Towns

---

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, and JUSTICES BOLICK, GOULD, LOPEZ, BEENE, and MONTGOMERY joined.

---

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1 The Arizona legislature has authorized municipalities to "appropriate and spend public monies for and in connection with economic development activities." A.R.S. § 9-500.11(A). This case addresses whether the City of Peoria violated article 9, section 7 of the Arizona Constitution (the "Gift Clause") by spending public funds to induce a

private university to open a branch campus in Peoria. We hold that the City violated the Gift Clause.

**BACKGROUND**

¶2        In 2010, the City of Peoria adopted strategies to spur economic development. One strategy was paying money to businesses in desirable fields, including higher education and technology, in return for their expansion within Peoria (existing businesses) or relocation there (new businesses). Another strategy was partially reimbursing eligible property owners for making tenant improvements to vacant commercial buildings in an underused area in Peoria known as the "P83 District." This case arises from the City's implementation of these strategies to persuade Huntington University, Inc. ("HU"), an accredited private institution based in Indiana, to open a branch in the P83 District.

¶3        In 2015, HU and the City entered into an agreement for HU to lease space from a private property owner and open a campus in the P83 District to offer undergraduate degrees in digital media. HU also agreed to refrain from offering similar programs in other Arizona cities for seven years and to participate in "economic development activities" with the City to attract other targeted industries to Peoria. In return, the City promised to pay HU up to $1,875,000 over a three-year period for developing the campus and programs if HU met specified "performance thresholds" that tracked HU's progress in opening and operating its campus.

¶4        To fulfill its agreement with the City, HU leased a building in the P83 District from Arrowhead Equities, LLC ("Arrowhead"). The City then agreed to reimburse Arrowhead up to $737,596 for renovating the building to suit HU's needs, contingent on Arrowhead meeting certain "performance criteria" tied generally to Arrowhead's performance of its lease obligations.

¶5        Plaintiffs are taxpayers residing in Peoria. They initiated this lawsuit to enjoin the above-described payments, asserting they violated the Gift Clause. The trial court granted summary judgment for the City and denied Taxpayers' cross-motion for summary judgment. The court of appeals affirmed in a divided decision. *Schires v. Carlat*, No. 1 CA-CV 18-0379, 2020 WL 390671, at *1 ¶ 1 (Ariz. App. Jan. 23, 2020) (mem. decision). While this lawsuit was pending, the City completed all payments to HU but remains obligated to make payments to Arrowhead. We accepted review

3

to clarify our Gift Clause jurisprudence and provide guidance to public entities entering into economic development agreements, matters of statewide importance.

## DISCUSSION

### I.  General principles

¶6        The Gift Clause provides:

> Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the state by operation or provision of law or as authorized by law solely for investment of the monies in the various funds of the state.

Ariz. Const. art. 9, § 7.   We have frequently described the historical impetus for this provision and analogous ones that exist in many state constitutions.   *See, e.g.*, *Day v. Buckeye Water Conservation & Drainage Dist.*, 28 Ariz. 466, 473 (1925); *Indus. Dev. Auth. of Pinal Cnty. v. Nelson*, 109 Ariz. 368, 372 (1973); *Turken v. Gordon*, 223 Ariz. 342, 346 ¶ 10 (2010).   In a nutshell, "the evil to be avoided was the depletion of the public treasury or inflation of public debt by [a public entity] engag[ing] in non-public enterprises," *State v. Nw. Mut. Ins. Co.*, 86 Ariz. 50, 53 (1959), or "by giving advantages to special interests," *Wistuber v. Paradise Valley Unified Sch. Dist.*, 141 Ariz. 346, 349 (1984).

¶7        We adopted a two-pronged test in *Wistuber* to determine whether a public entity has violated the Gift Clause.   First, a court asks whether the challenged expenditure serves a public purpose.   *See id.*   If not, the expenditure violates the Gift Clause, and the inquiry ends.   *See id.* If a public purpose exists, the court secondarily asks whether "the value to be received by the public is far exceeded by the consideration being paid by the public."   *Id.*   If so, the public entity violates the Gift Clause by "providing a subsidy to the private entity."   *Id.; see also Turken*, 223 Ariz.

4

at 345 ¶ 7, 347–48 ¶¶ 19–22 (applying the *Wistuber* test); *Cheatham v. DiCiccio*, 240 Ariz. 314, 318 ¶ 10 (2016) (same). The party asserting a Gift Clause violation bears the burden of proving it. *See Wistuber*, 141 Ariz. at 350.

## II. Application here

### A. Public purpose

¶8 What constitutes a "public purpose" has proved elusive to define. *See City of Glendale v. White*, 67 Ariz. 231, 236 (1948) (stating that the term "is incapable of exact definition," changes with the times, and is best elucidated by examples). In general, however, a public purpose promotes the public welfare or enjoyment. *Id.* at 237 (citing *City of Tombstone v. Macia*, 30 Ariz. 218, 228 (1926)); *see also Macia*, 30 Ariz. at 227–28 (stating cities are not limited to providing material necessities but may also "minister to their [citizens'] comfort, health, pleasure, or education" and listing less-obvious examples of permissible expenditures, such as opening an exhibit at an exposition and decorating buildings (citing Ruling Case Law, vol. 19, at p. 721)). A court can consider both direct and indirect benefits of a government expenditure in deciding whether it serves a public purpose and thus satisfies the first prong of the *Wistuber* test. *See Turken*, 223 Ariz. at 348–49 ¶¶ 24–27. In making this determination, a court should not concern itself with the wisdom or necessity of the expenditure in question, as those considerations lie exclusively within the public entity's discretion. *See Nelson*, 109 Ariz. at 371.

¶9 Perhaps because of the difficulty in precisely defining "public purpose," courts take "a broad view of permissible public purposes" and give significant deference to the judgment of elected officials, who are tasked with identifying and furthering such purposes. *See Turken*, 223 Ariz. at 346 ¶ 28 ("[T]he primary determination of whether a specific purpose constitutes a 'public purpose' is assigned to the political branches of government, which are directly accountable to the public."); *see also White*, 67 Ariz. at 237 (affording the city council "some latitude" in deciding whether membership in a city league would benefit the city and refusing to interfere with that judgment absent adverse proof); *Wistuber*, 141 Ariz. at 349 ("[C]ourts must not be overly technical and must give appropriate deference to the findings of the governmental body."). As we reiterated in *Turken*, "[w]e find a public purpose absent only in those rare cases in which the governmental body's discretion has been 'unquestionably abused.'" 223 Ariz. at 349 ¶ 28; *cf. White*, 67 Ariz. at 238 (characterizing a

prior case as recognizing that public money spent to defeat a proposed amendment to the Workmen's Compensation Law served a political purpose rather than a public purpose (citing *Sims v. Moeur*, 41 Ariz. 486 (1933))).

¶10        The City found that incentivizing HU to establish a branch campus in the P83 District and reimbursing Arrowhead for part of HU's tenant improvements would serve the public by (1) diversifying the City's economic base and work force and (2) revitalizing an underused area in the City.   Taxpayers argue that stimulating economic development by paying private businesses like HU and Arrowhead to operate in the City is a "secondary, intangible, and indirect benefit[]" that cannot constitute a public purpose.   They assert that *Wistuber*'s first prong is satisfied only if a government expenditure produces direct benefits to the public and involves a traditional government function.

¶11        We rejected Taxpayers' narrow view of a public purpose in *Turken*.   There, we found that the City of Phoenix's agreement to pay a developer $97.4 million for public use of garage parking spaces in a mixed-use development served a public purpose.   *See Turken*, 223 Ariz. at 348 ¶ 23.   We went on to address Phoenix's argument that the agreement also served "several indirect public purposes," such as increasing the city's tax base, producing denser development, decreasing pollution, and increasing employment opportunities for residents.   *See id.* ¶ 24.   The court of appeals had questioned whether such indirect benefits could establish a public purpose under *Wistuber*.   *See id.* at 348–49 ¶ 25.   Citing examples from prior cases, however, we pointed out that our jurisprudence had never drawn a bright line excluding indirect benefits from serving public purposes.   *See id.* at 348–49 ¶¶ 25–27 (citing *White*, 67 Ariz. at 240 (joining a municipal league to learn how other cities solve problems); *Nelson*, 109 Ariz. at 373–74 (loaning money to a copper company to install air pollution control facilities that would protect public health); *Humphrey v. City of Phoenix*, 55 Ariz. 374, 387 (1940) (building low-income housing to clear slums, thus protecting against crime and disease and relieving unemployment)).

¶12        Here, the City did not unquestionably abuse its discretion in determining that its agreements with HU and Arrowhead served public purposes.   We have previously acknowledged that government expenditures for industrial development serve a public purpose.   *See Nelson*, 109 Ariz. at 373–74; *Turken*, 223 Ariz. at 349 ¶ 27.   Indeed, the

legislature has recognized the utility of such expenditures by authorizing cities to spend monies "for and in connection with economic development activities." § 9-500.11(A). The fact that HU and Arrowhead also benefit, even primarily, does not alter the public purposes of the City's expenditures. *See Nelson*, 109 Ariz. at 373 ("If there is a public purpose the loan or donation is not prohibited even though some organization derives special benefit from the project."); *Turken*, 223 Ariz. at 348 ¶ 21 (rejecting consideration for Gift Clause purposes of whether private interests are unduly promoted). The HU and Arrowhead agreements satisfy prong one of the *Wistuber* test.

## B. Sufficient consideration

¶13 The second *Wistuber* prong acts as the primary check on government expenditures for Gift Clause purposes. To reiterate, under that prong, an expenditure violates the Gift Clause if "the value to be received by the public is far exceeded by the consideration being paid by the public." *Wistuber*, 141 Ariz. at 349; *see also Turken*, 223 Ariz. at 350 ¶ 35 ("[I]f the City's payments to NPP under the Parking Agreement are grossly disproportionate to the objective value of what NPP has promised to provide in return, the consideration prong of the *Wistuber* test has not been satisfied.").

¶14 Although the consideration paid by a public entity may be legally sufficient under contract law, it does not necessarily follow that it is sufficient under the Gift Clause "because paying far too much for something effectively creates a subsidy from the public to the seller." *See Turken*, 223 Ariz. at 349–50 ¶ 32. Our inquiry, therefore, focuses on what the public is giving and getting from an arrangement and then asks whether the "give" so far exceeds the "get" that the government is subsidizing a private venture in violation of the Gift Clause. *See Yeazell v. Copins*, 98 Ariz. 109, 112 (1965) ("The state may not give away public property or funds; it must receive a *quid pro quo* which, simply stated, means that it can enter into contracts for goods, materials, property and services."). The relevant "consideration" consists of direct benefits that are "bargained for as part of the contracting party's promised performance," and does not include "anticipated indirect benefits." *See Turken*, 223 Ariz. at 350 ¶ 33. "[A]nalysis of adequacy of consideration for Gift Clause purposes focuses . . . on the objective fair market value of what the private party has promised to provide in return for the public entity's payment." *Id.*

¶15 Here, the court of appeals concluded that Taxpayers failed to prove that the consideration paid by the City far exceeded the returned value. *See Schires*, 2020 WL 390671, at \*5 ¶¶ 22–23. It relied on the City's expert, who opined that "the appropriate way to measure the fair market value [the City] received from the agreements was to measure the economic impact of the campus within the [City's] limits," which the expert found was $11.3 million—an amount far greater than the City's maximum payment of $2,612,596.[1] *See id* at ¶ 22. The court rejected Taxpayers' argument that the anticipated economic impact from the HU campus was an irrelevant "indirect benefit" per *Turken* and instead found it resulted from "Arrowhead and HU promis[ing] to open a Peoria campus of HU in the P83 district." *See id.*

¶16 We agree with the court of appeals dissent that the economic impact from the agreements with HU and Arrowhead is an "anticipated indirect benefit" that is valueless under *Wistuber*'s second prong. *See id.* at \*6 ¶¶ 27, 30 (Morse, J., dissenting). As *Turken* instructs, the adequacy of consideration under the second prong focuses on the value of "what the private party has promised to provide in return for the public entity's payment." *Turken*, 223 Ariz. at 350 ¶ 33. Neither HU nor Arrowhead signed an enforceable promise to provide the City with any particular economic impact. Likewise, neither promised to provide the City with any goods or services, such as an ownership interest in the campus building or reduced tuition for Peoria residents. They simply promised to engage in their respective private businesses (educating and leasing).

¶17 In effect, HU and Arrowhead's promises are no different than a hamburger chain promising to operate in Peoria in exchange for monetary incentives paid by the City in hope of stimulating the local economy. A private business will usually, if not always, generate some economic impact and, consequently, permitting such impacts to justify public funding of private ventures would eviscerate the Gift Clause. *See Kromko v. Ariz. Bd. of Regents*, 149 Ariz. 319, 321 (1986) ("Public funds . . . cannot be used to foster or promote the *purely private or personal interests of any individual*." (quoting *Town of Gila Bend v. Walled Lake Door Co.*, 107 Ariz. 545, 549 (1971))); *Turken*, 223 Ariz. at 346 ¶ 10 (noting the Gift Clause "was designed primarily to prevent the use of public funds . . . in aid of enterprises . . .

---

[1] The expert measured "economic impact" as the value of all goods, services, and increased labor income to households produced as a result of the construction and operation of the HU campus for a five-year period.

actually engaged in private business" (citing *Day*, 28 Ariz. at 473)). It makes no difference that HU would not have opened a campus in Peoria, and Arrowhead would not have renovated and leased its building, absent public funding. The anticipated economic impact from the HU campus in the P83 district is irrelevant to *Wistuber*'s second-prong inquiry.

¶18 Relatedly, the City asserts that its expectation of receiving $206,630 in municipal tax revenue during the first five years of HU's presence in Peoria is a direct benefit that constitutes value for Gift Clause purposes. A business's obligation to pay taxes is independent of an economic development agreement. As with anticipated economic impact, fiscal impact is an indirect benefit that is irrelevant to our analysis. *See Turken*, 223 Ariz. at 350 ¶ 38 (rejecting argument that taxes generated from mixed-use development contributed to the value of the parking spaces provided to the public where the developer lacked any obligation "to produce a penny of tax revenue").

¶19 The court of appeals majority alternately found sufficiently valuable consideration provided by HU and Arrowhead because: (1) HU had the obligation to spend at least $2.5 million to open its Peoria campus; (2) Arrowhead was obligated to make tenant improvements to its own building; (3) HU agreed to refrain from opening a campus in other Arizona cities for at least seven years; and (4) HU agreed to help the City with "economic development activities." *See Schires*, 2020 WL 390671, at *5 ¶ 23. We disagree.

¶20 The initial three reasons provide no value to the City except to generate an anticipated positive economic impact in Peoria, which we have explained is an irrelevant indirect benefit. And, although HU and Arrowhead's promises to invest in their own businesses—and in HU's case to also forbear operating in other cities—may be sufficient consideration under contract law, they provide no bargained-for direct benefit to the City and are therefore insufficient under the Gift Clause. *See Turken*, 223 Ariz. at 350 ¶ 33.

¶21 As to the fourth reason, the record does not contain evidence that HU's obligation to "participate in economic development activities with the City" holds any value, much less one approaching $2.6 million. The HU agreement does not define those "activities," other than to state that they include "the development of customized work force development plans and programs for targeted industries sought by the City as part of its

9

business attraction efforts," and "participation in meetings with business prospects, the creation of custom training programs to meet workforce development needs, and marketing activities." But the HU agreement does not define the duration of this commitment, how many meetings must be attended, what developing plans and programs entails or how many programs HU must prepare, or what is meant by "marketing activities." Also, HU does not guarantee any economic return for its efforts, nor are the City's payments to HU triggered by performance of this obligation. In short, this contract term may be too indefinite to enforce, much less value. *See Savoca Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394 (1975) ("It is elementary that for an enforceable contract to exist there must be . . . sufficient specification of terms so that the obligations involved can be ascertained."). The City argues that the inability to quantify the fair market value of this obligation means Taxpayers did not meet their burden of proof. But the City may not avoid scrutiny of a contractual obligation's value by providing insufficient detail to permit valuation.

¶22 Regardless, Taxpayers' motion for summary judgment presented its expert's opinion that the City received no value from its agreements with HU and Arrowhead, which necessarily includes the obligation to participate in economic development activities. The City countered this evidence only with a valuation based on economic impact, which its expert said was the appropriate way to calculate the agreements' value to the City, and provided no evidence of tangible free-standing value for HU's promise to participate in economic development activities. On this record, Taxpayers satisfied their burden to show that the City's payments to HU and Arrowhead far exceeded the value of that obligation.

¶23 Notably, the court of appeals gave deference to the City's determination that it would receive "an equitable or proportional economic return" in exchange for its payments. *Schires*, 2020 WL 390671, at *5 ¶ 23. We recognize that in *Cheatham*, this Court stated that "courts must give due deference to the decisions of elected officials" in applying the second prong. 240 Ariz. at 322 ¶ 35. We now disapprove that statement. The Court cited no authority for its position. *See id.* Earlier in the opinion, it cited *Wistuber*'s statement that in applying the two-prong test, courts "must give appropriate deference to the findings of the governmental body." *Id.* at 318 ¶ 10 (quoting *Wistuber*, 141 Ariz. at 349). But deferring to the public entity under the second prong is not "appropriate," as the inquiry is an objective one and does not involve subjective policy decisions. *Cf. Macia*, 30 Ariz. at 226 ("The question of what is a public purpose is a changing

question, changing to suit industrial inventions and developments and to meet new social conditions."). In deciding the sufficiency of consideration under the second prong, courts should not give deference to the public entity's assessment of value but should instead identify the fair market value of the benefit provided to the entity and then determine proportionality.

¶24 In sum, although economic development activities can fulfill a public purpose, the public entity must receive a bargained-for benefit as part of the private party's performance, and the payment of public funds must not be grossly disproportionate to the fair market value of that benefit. Here, the City's payments to HU and Arrowhead did not satisfy *Wistuber*'s second prong, and the City therefore violated the Gift Clause.

## C. Attorney fees

¶25 Taxpayers request an award of attorney fees under the private attorney general doctrine, which authorizes fees for "a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 8 ¶ 26 (2013). The City has not objected to this request. In the exercise of our discretion, we grant the request, subject to Taxpayers' compliance with ARCAP 21(b).

## CONCLUSION

¶26 We reverse the trial court's judgment in favor of the City and remand to that court with directions to enter summary judgment in favor of Taxpayers. We vacate the court of appeals decision.