IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**MARK GILMORE,**[*] **ET AL.,**
*Plaintiffs/Appellants,*

*v.*

**KATE GALLEGO, ET AL.,**
*Defendants/Appellees.*

---

No. CV-23-0130-PR
Filed July 31, 2024

---

Appeal from the Superior Court in Maricopa County
The Honorable Daniel G. Martin, Judge
No. CV2019-009033
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
255 Ariz. 169 (App. 2023)
**VACATED**

---

COUNSEL:

Jonathan Riches (argued), Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Mark Gilmore and Mark Harder

John Alan Doran (argued), Matthew A. Hesketh and Carli J. Simkin, Sherman & Howard, L.L.C., Phoenix, Attorneys for Kate Gallego, Jeff Barton and the City of Phoenix

---

[*] Counsel for Petitioner Mark Gilmore notified this Court of Gilmore's death during the pendency of this case. The claims survive as to Petitioner Mark Harder.

Daniel L. Bonnett (argued), Jennifer Kroll, Martin & Bonnett, P.L.L.C., Phoenix, Attorneys for American Federation of State, County and Municipal Employees, (AFSCME), Local 2384

Gerald Barrett, Ward, Keenan & Barrett, P.C., Phoenix; Leon Dayan, Joshua A. Segal and Bruce Lerner, Bredhoff & Kasier, P.L.L.C., Washington, D.C., Attorneys for Amicus Curiae Heidi Shierholz

Kristin K. Mayes, Arizona Attorney General, Alexander W. Samuels, Principal Deputy Solicitor General, Luci D. Davis, Senior Litigation Counsel, Phoenix, Attorneys for Amicus Curiae State of Arizona

Drew C. Ensign, Brennan Bowen, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Attorneys for Amici Curiae Arizona Free Enterprise Club and Grand Canyon Legal Center

Grant H. Frazier, Dustin D. Romney, Frazier Law, PLLC, Scottsdale; Bernard Zamaninia, National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, Attorneys for Amicus Curiae National Right to Work Legal Defense Foundation, Inc.

Dennis I. Wilenchik, John "Jack" D. Wilenchik, Garo V. Moughalian, Phoenix, Attorneys for Amicus Curiae Freedom Foundation

Jacob H. Huebert, Liberty Justice Center, Chicago, Illinois, Attorneys for Amicus Curiae Liberty Justice Center

————————

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICES BRUTINEL, BEENE, MONTGOMERY, and KING joined.

————————

JUSTICE BOLICK, Opinion of the Court:

**¶1** We consider here the constitutionality of "release time" provisions in a memorandum of understanding ("MOU") between the City of Phoenix (the "City") and the American Federation of Federal, State and Municipal Employees, Local 2384 (the "Union"). The provisions permit certain employees, while paid by the City, to be released from the duties for which they were hired to instead perform "lawful union activities" and other tasks under the Union's direction.

**¶2** We conclude that the release time provisions do not violate the free-speech or free-association guarantees of the First Amendment or article 2, section 6 of the Arizona Constitution, or the right-to-work protections of article 25 of the Arizona Constitution or A.R.S. § 23-1302, because the City, and not the employees, pays for the release time. Therefore, the employees are not compelled to subsidize speech with which they disagree, nor are they required to make a mandatory union contribution. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 929–30 (2018); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO Loc. 2384 v. City of Phoenix*, 213 Ariz. 358, 366 ¶ 29 (App. 2006). However, we conclude that the provisions violate the Gift Clause of article 9, section 7 of the Arizona Constitution for the reasons detailed below.

## BACKGROUND

**¶3** The City organizes its employees into units "for the purpose of choosing an authorized representative to engage, in its behalf, in the meet and confer process." Phx., Ariz., Code ch. 2, art. 17 ("PCC") § 2-210(1). That is the process through which the City and the authorized representative of a unit bargain for "wages, hours, and other terms and conditions of employment" that are binding on all employees in the unit. PCC § 2-210(11). The terms agreed to by the City and authorized representative are memorialized in an MOU. *Id.* After the City Council approves the MOU, it becomes effective. PCC § 2-215(C). The maximum term for an MOU is three years. PCC § 2-215(B).

**¶4** Unit II consists of approximately 1,500 skilled tradespeople. *See* PCC § 2-212(A)(2)(b). The Union has acted as Unit II's authorized representative since 1976. Roughly 671 Unit II employees are members of the Union.

**¶5**        The Union and the City negotiate a new MOU for Unit II employees every two years.  Generally, the MOUs contain "release time" provisions.  While on release time, "employees are released from their normal job duties but still paid at the same rate(s) of pay by the City," *Gilmore v. Gallego*, 255 Ariz. 169, 173 ¶ 4 (App. 2023), to engage in "lawful union activities."  The MOU also provides examples of services that may be performed for the City or the Union on release time.

**¶6**        The 2014–2016 MOU, however, did not provide for release time.   Under the 2014–2016 MOU, Unit II employees received eight additional hours of vacation time that they could donate to a bank of hours to fund release time.

**¶7**        In 2019, the City and Union agreed to an MOU that included release time.  Specifically, the MOU provided for (1) four full-time, paid release positions for Union members, including the Union President, "to engage in lawful union activities"; (2) a bank of 3,183 additional paid release time hours per year for Union members "to engage in lawful union activities"; (3) a bank of 150 additional paid release time hours per year for Union members to attend Union seminars, lectures, and conventions; and (4) $14,000 in reimbursements to the Union per year to pay for Union members to attend schools, conferences, workshops, and trainings.

**¶8**        The MOU states that the four full-time released employees "agree to participate" in "citywide task forces and committees, Labor-Management work groups, and a variety of Health and Safety committees."  The Labor-Management Committee meets "monthly or at other mutually scheduled times."  The Health and Safety Committee meets "quarterly or at other mutually scheduled times."  Because serving on these committees "take[s] time away from [the] expected [Union] tasks" of released employees, the MOU provides the Union President with 208 hours in his compensatory time bank and the other three full-time released employees with eighty hours each in their compensatory time banks per year.  Under such circumstances, the released employees receive both their salaries and compensatory time, as well as City benefits and pension eligibility.

¶9        The MOU authorizes the Union to designate union stewards to represent Unit II employees in grievance proceedings. The MOU states employees "have the right to have the Union serve as their 'meet and confer' representative" and to be represented by the Union in grievance proceedings, regardless of membership in the Union.

¶10        The MOU also provides "examples" of how release time may be used:

> Examples of work performed by the release positions in support of the City include ensuring representation for employees during administrative investigations and grievance/disciplinary appeal meetings with management; participating in collaborative labor-management initiatives that benefit the City and the members; serving on City and departmental task forces and committees; facilitating effective communication between City and Department management and employees; assisting members in understanding and following work rules; and administering the provisions of the Memorandum of Understanding. Union release is also used for authorized employees to prepare for appeals and hearings and attend Union conferences, meetings, seminars, training classes and workshops so that employees better understand issues such as City policies and practices, conflict resolution, labor-management partnerships, and methods of effective representation.

(Emphasis omitted.) However, in practice, release time is also used for unlisted activities, like Union recruitment. Although the City ordinarily controls and supervises employee activities, it does not control or supervise how released employees spend their time and released employees do not report their activities to the City.

¶11        The MOU's release time provisions cost the City approximately $499,000 per year. The MOU states, "[t]he cost to the City for these release positions and release hours, including all benefits, has been charged as part of the total compensation detailed in this agreement."

¶12        At all relevant times, Petitioners Mark Gilmore and Mark Harder (the "Employees") worked in Unit II but did not belong to the Union. *Gilmore*, 255 Ariz. at 174 ¶ 6. The Employees sued the City, arguing

the MOU's release time provisions violate their free-speech, free-association, and right-to-work rights. *Id.* The Employees also alleged the release time provisions violate the Gift Clause. *Id.* The Union intervened as a defendant. *Id.* We refer to the City and the Union collectively as the "Respondents." The Employees and the Respondents filed motions for summary judgment on all claims. *Id.* ¶ 7. The trial court granted the Respondents' motion for summary judgment. *Id.* The trial court determined release time did not violate the Employees' free-speech, free-association, and right-to-work rights because the Employees do not pay for release time. *Id.* The trial court also determined the release time provisions did not violate the Gift Clause because they serve a public purpose and are supported by adequate consideration. *Id.*

¶13 The Employees appealed. *Id.* ¶ 8. The court of appeals, in a split opinion, affirmed the trial court's grant of summary judgment in favor of the Respondents. *Id.* at 182 ¶ 45. Like the trial court, the court of appeals held that the release time provisions did not violate the Employees' free-speech, free-association, and right-to-work rights because the Employees do not pay for release time. *Id.* at 176 ¶ 19. The court of appeals also held the release time provisions did not violate the Gift Clause because, under *Cheatham v. DiCiccio*, 240 Ariz. 314 (2016), the provisions serve a public purpose and are supported by adequate consideration. *Gilmore*, 255 Ariz. at 179–81 ¶¶ 29–41.

¶14 Although all three judges concurred in the majority's free-speech, free-association, and right-to-work analysis, one judge disagreed with the majority's Gift Clause analysis. *Id.* at 182–84 ¶¶ 46–53 (Bailey, J., concurring in part and dissenting in part). The dissent reasoned that *Cheatham* was not controlling because, unlike in *Cheatham*, the release time provisions here were not part of Unit II members' compensation package. *Id.* at 183 ¶ 48. The dissent observed that "the release time provisions were not negotiated for in lieu of wages and benefits but were negotiated separately." *Id.* Thus, it was proper to analyze the release time provisions separately, rather than the MOU as a whole, because they were part of a separate agreement. *Id.* ¶ 50. The dissent concluded that the release time provisions, standing alone, were not supported by adequate consideration because any benefits to the City were "anticipated indirect benefits at best," which are valueless under the consideration prong of the Gift Clause analysis. *Id.* at 183–84 ¶ 51.

**¶15** The Employees petitioned this Court for review. We granted review on the following issues: (1) whether the release time provisions violate the Employees' free-speech, free-association, and right-to-work rights; and (2) whether the release time provisions violate the Gift Clause. As release time is a widespread practice, the legal issue is one of statewide concern. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶16** "We review de novo a grant of summary judgment, 'viewing the evidence in the light most favorable to the party against whom summary judgment was entered.'" *S. Ariz. Home Builders Ass'n v. Town of Marana*, 254 Ariz. 281, 284 ¶ 16 (2023) (quoting *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 267 ¶ 10 (2021)). We interpret constitutional provisions de novo. *State v. Anderson*, 547 P.3d 345, 349 ¶ 13 (Ariz. 2024).

**¶17** The Employees argue their case in the alternative, depending on who pays for release time. If the Employees pay for release time through reduced and diverted compensation, they contend it compels them to support views with which they disagree, in violation of their freedom of speech, freedom of association, and right-to-work rights. If the City pays for it, the Employees contend such payments violate the Gift Clause. The Employees acknowledge that this Court upheld similar release time provisions against a Gift Clause challenge in 2016 in *Cheatham*, but they argue that *Cheatham* misapplied Gift Clause principles in light of past and subsequent decisions and that the release time provisions here differ materially for Gift Clause purposes from those upheld in *Cheatham*.

## A. Free-Speech, Free-Association, And Right-To-Work Claims

**¶18** The Employees' First Amendment arguments are predicated primarily on *Janus*, which the U.S. Supreme Court decided after *Cheatham*. The Court held in *Janus* that requiring public employees to provide financial support for union activities, including collective bargaining, violated the First Amendment because the practice impermissibly compelled speech. 585 U.S. at 930. In doing so, it overturned a longstanding contrary prior precedent, *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). *Janus*, 585 U.S. at 929.

**¶19**        The Court began with the well-established proposition that "[c]ompelling a person to *subsidize* the speech of other private speakers" implicates the First Amendment.  *Id.* at 893 (emphasis in original).  Noting that mandatory union dues were justified to support "labor peace," *id.* at 895, the Court declared that "the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay."  *Id.* at 897.  The Court's holding was categorical: "Neither an agency fee *nor any other payment to the union* may be deducted from a nonmember's wages . . . unless the employee affirmatively consents to pay."  *Id.* at 930 (emphasis added); *cf. Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 284 ¶¶ 54–55 (2019) (post-*Cheatham* decision citing *Janus* in striking down compelled speech under the First Amendment and article 2, section 6 of the Arizona Constitution).

**¶20**        If the Employees paid for release time through reduced or diverted compensation, it would present colorable claims under *Janus* and Arizona's right-to-work laws because the Employees would be required, against their will, to support union activities (including collective bargaining) with which they might disagree.  But we need not resolve this issue because we agree with the court of appeals that the City, not the Employees, pays for release time under this MOU.[1]  *See Gilmore*, 255 Ariz. at 175–76 ¶¶ 12–18.

**¶21**        Arguing to the contrary, the Employees rely primarily on an MOU provision stating that "[t]he cost to the City for these release positions and release hours . . . has been charged as part of the total compensation detailed in this agreement."  But undisputed testimony indicated that "total compensation" means the City's total expenditure under the MOU, not the

---

[1]  The court of appeals appears to contradict itself on this point when discussing consideration for purposes of the Gift Clause.  *See Gilmore*, 255 Ariz. at 180–81 ¶ 38 (stating that "the record shows that the release time provisions were bargained for as a part of the Unit II compensation"; specifically, "in lieu of eight additional hours of vacation time").  Either the City or the Employees pay for release time; it cannot be one thing for First Amendment purposes and another for Gift Clause analysis.  We conclude that release time is not part of employee compensation under the MOU before us.

sum entitlement of the Employees. Total compensation includes employee wages, tool allowances, and expenditures for equipment and infrastructure.

¶22 The Employees also point to the fact that they received more vacation time under the 2014–2016 MOU, which did not provide for release time. However, even if the additional vacation time under that MOU was converted to release time under the MOU at issue in this case, the Employees do not have a right to hypothetical vacation hours just because the older MOU provided for them. *See Paczosa v. Cartwright Elementary Sch. Dist. No. 83*, 222 Ariz. 73, 77 ¶ 15 (App. 2009) (holding a school district's governing board was allowed to decrease fringe benefits offered to employees under a new contract); *Abbott v. City of Tempe*, 129 Ariz. 273, 277–78 (App. 1981) (holding a city was entitled to decrease firefighters' rate of holiday pay and accrual of vacation credits under new contract where the older contract did not provide for future employment with old benefits); *Bennett ex rel. Ariz. State Pers. Comm'n v. Beard*, 27 Ariz. App. 534, 537 (1976) (holding a state employee had no "contractual right to continue his past leave benefits into future employment").

¶23 Further, no evidence suggests that, absent release time, the Employees' pay or benefits would necessarily be commensurately increased. By contrast, as the court of appeals pointed out, the agreement in *Cheatham* provided that release time was "charged as part of the total compensation contained in this agreement *in lieu of wages and benefits*." *Gilmore*, 255 Ariz. at 176 ¶ 17 (quoting *Cheatham*, 240 Ariz. at 319 ¶ 14) (emphasis in original). No such provision appears in this MOU, and the trial court concluded that it was undisputed that the City paid for release time. *Id.* at 175 ¶ 12. We see no reason to disturb the trial court's predicate ruling on that issue. Because we conclude that release time is not a substitute for compensation, we hold that the Employees here do not have a colorable compelled speech or right to work claim, and therefore proceed to determine whether the release time provisions violate the Gift Clause.

## B. Gift Clause Claim

¶24 We begin with the language of the Gift Clause, which provides that neither the state nor its subdivisions "shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation." Ariz. Const. art. 9, § 7. Adopted from the constitutions of other states, the Gift Clause was

"designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to quasi public purposes, but actually engaged in private business." *Day v. Buckeye Water Conservation & Drainage Dist.*, 28 Ariz. 466, 473 (1925) (quoting *Thaanum v. Bynum Irrigation Dist.*, 232 P. 528, 530 (Mont. 1925)); *accord Turken v. Gordon*, 223 Ariz. 342, 346 ¶ 10 (2010). Accordingly, this Court has consistently applied the rule that "[p]ublic funds are to be expended only for 'public purposes' and cannot be used to foster or promote the purely private or personal interests of any individual." *See, e.g.*, *Town of Gila Bend v. Walled Lake Door Co.*, 107 Ariz. 545, 549 (1971). To satisfy the Gift Clause, a public expenditure must (1) serve a public purpose and (2) be supported by adequate consideration. *Schires v. Carlat*, 250 Ariz. 371, 374–75 ¶ 7 (2021).

**¶25** This Court first confronted a Gift Clause challenge to release time in *Wistuber v. Paradise Valley Unified School District*, 141 Ariz. 346 (1984). In *Wistuber*, a school district agreed to either release a teacher who served as union president from some of her teaching duties or permit her to forego them altogether. In either circumstance, the district would pay a portion of her teacher salary in exchange for specified responsibilities to "aid the District in performing its obligations." *Id.* at 348 & n.2. In assessing a potential Gift Clause violation, the Court instructed that "[t]he reality of the transaction both in terms of purpose and consideration must be considered. A panoptic view of the facts of each transaction is required." *Id.* at 349.

**¶26** By that language, we take that the *Wistuber* Court meant we should overlook neither the forest nor the trees. On the one hand, we should consider the totality of the circumstances of the contract (the "panoptic view"). On the other hand, an illegal subsidy cannot be sheltered from scrutiny merely because it is embedded within an otherwise valid contract (the "reality of the transaction"). *See State v. N.W. Mut. Ins. Co.*, 86 Ariz. 50, 54 (1959) (instructing that we should "strive for a panoptic view of the constitutional facts of a particular transaction and *to consider the significance of incidental features* according to their appearance in proper perspective" (emphasis added)); *see also Turken*, 223 Ariz. at 352 ¶ 47 ("*Northwestern Mutual* used the term 'panoptic' in rejecting the contention that the initial [insurance] premium payments violated the Gift Clause. The language was thus meant to reject an overly technical view of the transaction." (internal citation omitted)).

**¶27**        Applying the public purpose and consideration criteria, the *Wistuber* Court examined the release time provisions of the collective-bargaining agreement and found them constitutional. 141 Ariz. at 349-50. The Court concluded that "the duties imposed upon [the union president] by the proposal [were] substantial, and the relatively modest sums required to be paid by the District [were] not so disproportionate as to invoke the constitutional prohibition." *Id.* at 350.

**¶28**        Three decades later, in *Cheatham,* a divided Court upheld much more extensive release time provisions in a police union contract, encompassing multiple full-time release positions and a bank of thousands of release time hours. 240 Ariz. at 316 ¶ 1, 317 ¶¶ 3–5. The majority concluded that release time objectives—such as harmonious working relationships and an efficient and readily available point of contact for resolving union-management concerns—along with examples of how release time could be used, constituted an adequate public purpose. *Id.* at 320 ¶ 23, 321 ¶ 26. The majority further found that "release time [was] a component of the overall compensation package" negotiated between the city and the union, and that "if the City had not agreed to pay for release time, the corresponding amounts would have otherwise been part of the total compensation available." *Id.* at 318–19 ¶ 14; *see also id.* at 323 ¶ 40 ("The MOU acknowledges that the costs to the City associated with release time were in lieu of wages and benefits . . . ."). Hence, applying a "panoptic view," the majority viewed release time against the overall value of services provided by the officers. *Id.* at 320 ¶ 18. According "due deference to the decisions of elected officials" on adequacy of consideration, the majority concluded that the City's payments for release time were not grossly disproportionate to the value of the obligations. *Id.* at 322–23 ¶¶ 33, 35.

**¶29**        The dissenters disagreed that the release time provisions served a public purpose or provided adequate consideration for the public funds expended. *Id.* at 324–26 ¶¶ 45–55 (Timmer, J., joined by Brutinel, J., dissenting). They declared that "[n]o public purpose is served by diverting officers from safeguarding the public to work almost unchecked for [the union]." *Id.* at 324 ¶ 46. They noted that the trial court found that release time was not provided as a benefit or a substitute for employee compensation, a finding backed by extensive evidence. *Id.* at 325–26 ¶¶ 48–52. Finally, they concluded that consideration was inadequate given that "[t]he MOU does not obligate [the union] to provide any services to the City." *Id.* at 326 ¶ 54.

**¶30** More recently, this Court clarified its Gift Clause jurisprudence, resolving inconsistencies that were manifest between *Cheatham* and prior cases. *See Schires*, 250 Ariz. at 376–79 ¶¶ 13–24. In *Schires*, we struck down under the Gift Clause a city's financial incentives for a private postsecondary institution to relocate there. *Id.* at 378–79 ¶ 24. We reiterated the two-prong test from *Wistuber* requiring a public purpose and that the public expenditure not far exceed the value received from the private entity. *Id.* at 374–75 ¶ 7.

**¶31** As in our prior Gift Clause cases, we accorded "significant deference to the judgment of elected officials" in determining public purpose, encompassing both "direct and indirect benefits." *Id.* at 375 ¶¶ 8–9. However, we disapproved *Cheatham*'s statement that we accord deference to elected officials on the consideration prong, noting that "the Court cited no authority" for that proposition and that adequacy of consideration is an "objective" inquiry that "does not involve subjective policy decisions." *Id.* at 378 ¶ 23.

**¶32** Applying long-established Gift Clause principles, we stated that "[t]he relevant 'consideration' consists of direct benefits that are 'bargained for as part of the contracting party's promised performance,' and does not include 'anticipated indirect benefits.'" *Id.* at 376 ¶ 14 (quoting *Turken*, 223 Ariz. at 350 ¶ 33). We held anticipated indirect benefits did not constitute adequate consideration because the private parties did not make "an enforceable promise to provide the City with any particular economic impact." *Id.* at 377 ¶ 16. Likewise, there was no indication in that case that the private parties' agreement to participate with the city in economic development activities provided any economic value; nor was payment by the city conditioned on such performance; nor did the agreement provide sufficient detail to permit valuation. *Id.* at 378 ¶ 21. We concluded that "although economic development activities can fulfill a public purpose, the public entity must receive a bargained-for benefit as part of the private party's performance." *Id.* ¶ 24. This case differs in that the overall contract is one for services, and no one has challenged the monetary compensation and benefits provided by the City to the employees in return for their services to the City. Instead, the Employees challenge the payments by the City to employees to provide services to the Union.

**¶33** Citing *Cheatham*, the Union argues that under a "panoptic view" of the MOU, the City receives all the benefits of the

collective-bargaining agreement in exchange for the release time provisions; that is, Unit II employees agree to provide their services to the City. However, *Cheatham* is distinguishable.[2] Unlike in *Cheatham*, the release time provisions here are not directed towards the overall purpose of the collective-bargaining agreement. As the court of appeals dissent pointed out, "the MOU specifically excludes the union payments from employee compensation," *Gilmore*, 255 Ariz. at 183 ¶ 48 (Bailey, J., concurring in part and dissenting in part), and therefore "the release time provisions were not bargained for as part of the employees' compensation package." *Id.* at 184 ¶ 52. Indeed, the Union acknowledges that Unit II employees have received all compensation to which they are entitled, even without release time. For all these reasons, the benefits provided to the City by Unit II employees do not constitute consideration for the release time provisions and are therefore irrelevant to the constitutionality of those provisions.

¶34 As in all Gift Clause cases, courts must probe the reality of the transaction. *Wistuber*, 141 Ariz. at 349. Thus, release time should be separately scrutinized to determine if it has a public purpose and provides sufficient tangible, enforceable consideration to the City. We do not suggest that every provision in every contract must be scrutinized for Gift Clause purposes; to the contrary, the compensation as a whole provided to Unit II employees should be viewed in relation to the overall services they provide. *See Cheatham*, 240 Ariz. at 326 ¶ 52 (Timmer, J., dissenting) (explaining that a collective-bargaining agreement containing "[b]enefits such as health insurance, gym memberships, and emergency child care" may satisfy Gift Clause requirements if the benefits "substitute for the moneys an employee would otherwise pay for the benefit" and therefore qualify as employee compensation).

¶35 By the same token, it would negate the purposes of the Gift Clause if scrutiny could be avoided merely because a gift is contained within a larger contract. *See Turken*, 223 Ariz. at 347–48 ¶¶ 19–20 (describing the "core Gift Clause principle" that "public funds are to be expended only for public purposes and cannot be used to foster or promote the purely private or personal interests of any individual" (cleaned up)); *see*

---

[2] The Employees did not ask us to overrule *Cheatham* until oral argument. Because the Employees did not brief the applicable stare decisis principles, we do not resolve that question here.

*also Cheatham*, 240 Ariz. at 324 ¶ 45 (Timmer, J., dissenting) (stating that "permitting the City to subsidize [a union] simply because the release time terms are tucked within a collective bargaining agreement" undercuts the purpose of the Gift Clause); *Borgelt v. Austin Firefighters Ass'n, IAFF Loc. 975*, No. 22-1149, 2024 WL 3210046 at *9 (Tex. June 28, 2024) (stating in the context of challenged release time provisions that "*refusing* to assess individual provisions would allow a city to make an otherwise impermissible gift simply by inserting it into a larger contract" (emphasis in original)); *id.* at *22 (Busby, J., dissenting in part and concurring in part) (explaining that analyzing an agreement as a whole, instead of focusing on the challenged provision, would render the Gift Clause meaningless because "the City could agree to buy a red Ferrari for the Association president because another provision of the same agreement obligates firefighters to provide firefighting services that benefit Austin taxpayers"). Presumably, examining the "reality of the transaction" is why the Court in *Wistuber* so carefully scrutinized the release time provision even though it was a discrete part of a much larger collective-bargaining agreement. *See* 141 Ariz. at 347, 349–50.

**¶36** As a standalone contract between the Union and the City, the release time provisions here would plainly violate the Gift Clause for lack of consideration; including them as part of a larger contract does not insulate them from review. *See Schires*, 250 Ariz. at 374 ¶ 7, 377 ¶ 16 (stating that, when conducting a Gift Clause analysis, "a court asks whether *the challenged expenditure* serves a public purpose" and "the adequacy of consideration under the second prong focuses on the value of 'what *the private party* has promised to provide in return for the public entity's payment'" (quoting *Turken*, 223 Ariz. at 350 ¶ 33) (emphasis added)). Applying the principles consistently embraced in our earliest cases through *Schires*, we conclude that the release time provisions here violate the Gift Clause.

**¶37** As will appear below, the consideration prong of the Gift Clause is dispositive of our holding, but the public purpose prong is also problematic for the Respondents' argument. Our opinions consistently make clear that we largely defer to the determination of the elected body as to what constitutes sound public policy. *See Wistuber*, 141 Ariz. at 349 (stating courts "must give appropriate deference" to the public entity under the public purpose prong); *Cheatham*, 240 Ariz. at 320 ¶ 21 (same); *Schires*, 250 Ariz. at 375 ¶ 9 (same); *Turken*, 223 Ariz. at 346 ¶ 14 (same). However,

the public purpose prong is not ephemeral. *See, e.g.*, *Turken*, 223 Ariz. at 346 ¶ 14 (noting that although "courts owe significant deference to the judgments of elected officials," determining "whether governmental expenditures serve a public purpose is ultimately the province of the judiciary"). After all, the plain language of the Gift Clause aims to prevent subsidies to private individuals, associations, and corporations. The release time provisions at issue are precisely that: a "release" from the ordinary duties for which Unit II employees were hired, to instead perform, in the main, lawful *union* activities.

¶38        Moreover, when performing such activities, employees are released from the City's direct control and supervision, which is an essential criterion in determining public purpose. *See, e.g.*, *Kromko v. Ariz. Bd. of Regents*, 149 Ariz. 319, 321 (1986) (finding public purpose where the operations of a recipient of public funds were "still subject to the control and supervision of public officials," so "the fear of private gain or exploitation of public funds envisioned by the drafters of our constitution [was] absent"); *Walled Lake Door Co.*, 107 Ariz. at 549–50 (holding that public funding of water line that benefited a private business served a public purpose because the town retained "ownership and control" over the water line); *Wistuber*, 141 Ariz. at 348 (upholding release time provisions where the released employee recorded and logged her time with the public entity). Indeed, as the dissenting justices stated in *Cheatham*, "[n]o public purpose is served by diverting officers from safeguarding the public to work almost unchecked for [the union]. The City has no control over how [the union] directs the officers on release time and is not even told what the officers do for [the union]." 240 Ariz. at 324 ¶ 46 (Timmer, J., dissenting). The MOU before us is the same in these material respects.

¶39        Nonetheless, we do not rely on the more deferential public policy prong to invalidate the release time provisions here because they so clearly flunk the more demanding adequacy of consideration prong. The consideration equation for the release time provisions here is the converse of *Wistuber*: the City costs are substantial, but the benefits are so negligible as to render them largely illusory. The Union receives four full-time employees, who are released from their public duties but paid as if they were performing public work, for the Union to direct as it sees fit; an additional bank of 3,183 release time hours is established for the Union's use; compensatory hours are provided to release-time employees for assigned duties outside of union activities; 150 hours are provided for

seminars, lectures, and conventions; and up to $14,000 is made available to provide training for employee-relations skill development. The annual cost for release time is estimated at $499,000. In return, the MOU provides "examples" of the uses of release time, and the City argues that "release time promotes cooperative labor relations and facilitates an open dialogue about employment issues." At best, these are anticipated indirect benefits that do not count as enforceable obligations for consideration purposes. *See Schires*, 250 Ariz. at 376 ¶ 14.

**¶40** The Union and City point to a few tangible MOU obligations: participation on task forces and representation of Unit II employees in grievance proceedings. As previously noted, the four full-time released employees who serve on task forces collectively receive 448 additional hours in their compensatory time bank annually (on top of the salary and release time hours provided for in the MOU) because time spent serving on task forces "take[s] time away from [the] expected [Union] tasks" of released employees. Plus, these obligations are microscopic compared to the City's expenditure, *see Turken*, 233 Ariz. at 351 ¶ 43 (finding it "difficult to believe" services provided by a private party had "a value anywhere near" the public expenditure), and the City pays for release time regardless of the number of grievance proceedings that the Union represents Unit II employees in. In holding an economic development agreement invalid under the Gift Clause in *Schires*, we concluded the contract was "too indefinite to enforce, much less value," where the public entity's payments were not "triggered by performance of" the private parties' obligations. 250 Ariz. at 378 ¶ 21. The same principle applies here.

**¶41** To the extent that the City values the purposes to which release time might be devoted, it has not explained why it could not assign employees, under its direction and control, to perform precisely those tasks (such as serving on task forces), rather than placing them at the Union's disposal. Moreover, as the authorized representative of Unit II, the Union is already legally obligated to perform certain duties to Unit II employees. PCC § 2-214(B) ("Public employees shall have the right to be represented by an employee organization of their own choosing, to meet and confer through an authorized employee organization with their public employer in the determination of wages, hours and working conditions, and to be represented in the determination of grievances arising thereunder."). Preexisting legal obligations cannot constitute consideration for Gift Clause purposes. *Cf. Schires*, 250 Ariz. at 377 ¶ 18 (rejecting the argument that

16

private parties' preexisting obligation to pay taxes was consideration for Gift Clause purposes).

¶42          Indeed, the costs and benefits here are so one-sided that it is difficult to envision how such expansive release time provisions could ever survive the consideration prong unless the employees genuinely paid for them through foregone wages or otherwise—which then could give rise to a possible compelled speech or right to work claim.  The court of appeals noted that between 2014–2016, paid release time was eliminated in favor of a system in which Unit II employees could voluntarily donate vacation hours for release time, thus potentially avoiding any Gift Clause violations.  *Gilmore*, 255 Ariz. at 176 ¶ 18.  But that is not the provision before us.  The present MOU, which directs significant public funds and resources to the Union, represents an impermissible subsidy to a private entity.

¶43          For the foregoing reasons, we conclude that the release time provisions of the MOU are substantially disproportionate to any benefits received by the City, and therefore violate the Gift Clause.

## ATTORNEY FEES

¶44          The Employees request attorney fees under the private attorney general doctrine.  In the Court's discretion, the request is denied.

## CONCLUSION

¶45          The court of appeals' opinion is vacated and the outcome reversed.  The trial court's decision is reversed and the case is remanded to that court for the entry of judgment in favor of the Employees on the Gift Clause claim.